Debra WALKER, et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., Defendants.

Civ. A. No. 3–85–1210–R.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 4, 1989.
Revised Sept. 22, 1989.

---

**1232**

Michael M. Daniel, Elizabeth K. Julian, and Kenneth L. Schorr, North Central Texas Legal Services, Inc., Dallas, Tex., for plaintiffs.

Arthur Goldberg, Leslie K. Shedlin, Thomas H. Peebles, Jonathan Strong, Dept. of Justice, Civ. Div., Washington, D.C., Joseph G. Werner, Haynes & Boone, Marvin Collins, U.S. Atty., and Donald W. Hicks,

Hill, Hicks & Collins, Dallas, Tex., for defendants.

## MEMORANDUM OPINION—WALKER I: DHA VIOLATIONS OF THE CONSENT DECREE AND APPOINTMENT OF A SPECIAL MASTER

BUCHMEYER, District Judge.

This class action involves racial discrimination in low-income public housing in the City of Dallas and its suburbs. The parties are the plaintiff class ("plaintiffs"),[1] the Dallas Housing Authority ("DHA"), and the United States Department of Housing and Urban Development ("HUD").

■ This opinion[2] holds that DHA has violated the Consent Decree[3] approved in this matter on January 20, 1987 by:

(1) its delay in putting a new, non-discriminatory *Tenant Assignment & Selection Plan* into effect;

(2) its failure to provide *the tenant mobility services* required by the Decree;

(3) its actions concerning *the 120% Fair Market Rent Exception* for the use of § 8 certificates and vouchers in non-impacted areas of Dallas and its suburbs;

(4) its failure to meet *the Decree's first year goal for the use of § 8 assistance* in non-impacted areas, and its refusal to use a substantial number of § 8 certificates and vouchers allocated by HUD to DHA;

(5) its *failure to request code enforcement* from the City of Dallas on housing that failed Housing Quality Standards ("HQS"); and

(6) its *failure to meet the Decree's deadlines for* the site selection, construction, and initial occupancy of *the 100 units of new low income public housing.*

---

1. The class consists of "all black persons who are presently or who during the pendency of this Decree become either (a) residents of a DHA owned or managed project, or (b) participants in the DHA Section 8 Existing Housing Program" (Consent Decree, 2).

2. The opinion constitutes this Court's findings of fact and conclusions of law required by Rule 52,

Fed.R.Civ.P. *This opinion (originally filed Aug. 4, 1989) has been revised for publication primarily by the deletion of some 46 footnotes—which only contained references to exhibits and testimony in support of the various findings of fact.*

3. The Consent Decree is published, in full, as *Appendix A* to this opinion.

In addition—because DHA's violations of the Consent Decree have been repeated and pervasive—this opinion holds that *a special master will be appointed* to assist the Court by monitoring the performance of all parties under the Decree.[4]

## I. Procedural History

This suit was filed on June 25, 1985. At that time, suburbs of the City of Dallas were refusing to participate in DHA's § 8 assistance program; this prevented persons in need of low-income housing from using § 8 certificates or vouchers to move outside of minority areas in Dallas into non-impacted areas in the suburbs.[5]

After a number of suburb cities were dismissed from the suit when they agreed to participate in the § 8 program,[6] and after the filing of an amended complaint and class certification motion, the remaining parties were the plaintiffs, DHA and HUD. Then, after extended and often-heated negotiations,[7] on November 6, 1986, the plaintiffs filed an agreed motion for approval of a Consent Decree.[8]

On December 12, 1986—after proper notice had been given to members of the putative class[9]—a fairness hearing was held on the proposed settlement. Evidence was presented in support of the Consent Decree, and this Court heard objections—both oral and written—from those who opposed only one part of the Decree.[10] On January 9, 1987, this Court announced its approval of the Consent Decree in open court; then, after certain changes were made in the Decree as the result of the January 9 ruling, the Consent Decree was approved and entered on January 20, 1987.[11]

On February 9, 1987—*just 20 days after the approval of the Consent Decree*—the plaintiffs filed a motion charging DHA with violating the Decree because of its plan to stop the assignment of any more tenants to the West Dallas project. This matter was not resolved because, at an in-chambers conference, the Court suggested that the motion was premature.

Then, on July 1, 1987, the plaintiffs filed their Motion to Modify and Enforce The Consent Decree—which charged the DHA with a "massive failure to comply with the numerous remedial provisions of the Decree" and the failure to commit the resources necessary to implement the De-

4. *CAVEAT: This opinion is based upon the actions of DHA prior to January 23, 1989, when DHA hired a new Executive Director, Mr. Alphonso Jackson. The last hearing in this case was held on Dec. 12 and 14, 1988—so this opinion is not intended to reflect in any way upon DHA's performance under Executive Director Jackson.*

5. Landlords who participate in the § 8 program receive only a portion of the rent from the tenants—e.g., a maximum of 30% of adjusted gross income in the case of a § 8 certificate—and DHA pays the balance of the "fair market rent" with funding from HUD.

6. The cities dismissed in this manner were Carrollton, Plano, Richardson, Mesquite, Irving, Addison, Garland and Farmers Branch.

7. See the companion opinion in "*Walker II:* The Frost Amendment and the Anti–Demolition Statute" (which will be cited as "*Walker II*"). The third companion opinion, "*Walker III:* Joinder of the City of Dallas as a Defendant Subject to the Consent Decree," will be cited as "*Walker III.*"

8. The Consent Decree is cited in all these companion opinions as "Consent Decree ____," and the Plan attached to the Decree as Exhibit B is cited as "Decree Plan ____," with references to the *paragraphs* of both the Decree and the Plan. The periodic reports which DHA was required to fill under the Consent Decree will be cited with the name and date of each report, e.g., "DHA First Annual Report, pp. ____ (Jan. 20, 1988).

9. See *Walker v. City of Mesquite,* 858 F.2d 1071, 1072–73 (5th Cir.1988).

10. There was no objection to those parts of the Decree which were intended to improve the quality of all housing occupied by DHA tenants, to provide an opportunity for persons to move out of minority areas into non-impacted areas in Dallas and its suburbs, and to prevent DHA from discriminating against people on the basis of race. The *only* objection was to the demolition—but not the renovation—of certain units in DHA's West Dallas project. See this Court's opinions in *Walker II* and *Walker III.*

11. The Class Certification Order and the Court's written "Findings of Fact and Conclusions of Law Approving The Proposed Consent Decree" were also entered on Jan. 20, 1987. These are published, in full, as *Appendix B* to this opinion.

cree.[12] And, on September 10, 1987, the plaintiffs filed a Supplemental Motion to Enforce Decree, which asked this Court to require DHA to select a site for the 100 units of new Low Rent Public Housing ("LRPH")—which, under the Decree, should have been done by April 20, 1987.

On September 18, 1987, there was a hearing on the September 10 "site selection" motion. At that time, the Court ordered DHA to select the *"Country Creek"* site for the 100 new units of low-income housing—and ruled that DHA had violated the Decree by failing to meet the deadline for site selection. (Decree Plan III, 10).

Next, the plaintiffs and DHA reached agreement to resolve many of the problems raised by the plaintiffs' July 1 motion. However, HUD raised certain objections, and DHA refused to implement the agreed changes. Accordingly, on December 21, 1987, a hearing was held on the July 1, 1987 motion and on HUD's objections to the stipulations between the plaintiffs and DHA. HUD's objections were overruled and DHA's refusal to assign tenants to West Dallas was held to be a violation of the Consent Decree. However, some major issues presented by the plaintiffs' July 1, 1987 motion were left unresolved.[13]

On February 8, 1988—just one year after approval of the Consent Decree—the plaintiffs filed their third motion to compel DHA's compliance with the Consent Decree ("Motion to Modify and Enforce Consent Decree"). A hearing was held on this motion *and* the matters remaining under the plaintiffs' July 1, 1987 motion—as well as a DHA "Motion to Compel HUD Approval of 100–Unit LRPH Project"—on March 25 and 28, 1988. At that hearing, the Court ordered HUD to approve DHA's proposal for the 100 new units at *Country Creek.*

Then, next, on August 2, 1988, the plaintiffs filed a "Motion to Restore Deprogramed Units"—and on the same day DHA filed its "Motion to Enforce Consent Decree." Both motions charged HUD with violating the Consent Decree by refusing to continue payments to DHA for the units which were vacant at the West Dallas project. A hearing was held on this motion on November 1, 1988. At this time, the Court ordered HUD to resume full funding for the vacant units at West Dallas.

The last hearing held in this matter was on December 12 and 14, 1988. It dealt primarily with the plaintiffs' motion to modify the Consent Decree by joining the City of Dallas,[14] and with several motions concerning the effect of the Frost Amendment and the "Anti–Demolition Statute" on the Decree.[15] However, it also concerned the unresolved matters raised by the plaintiffs' motions of July 1, 1987 and February 8, 1988—which charge DHA with violations of the Consent Decree and which seek the appointment of a Special Master. These unresolved matters are the subject of this opinion (*Walker I*).

## II. DHA Violations of the Consent Decree

DHA has, in fact, repeatedly violated the provisions of the Consent Decree. As summarized above, these violations required three separate motions by the plaintiffs and four separate hearings during the first two years of the Decree. The DHA violations will be discussed in the order listed in the introduction of this opinion.[16]

---

**12.** The July 1, 1987 motion alleged no less than 13 separate violations of the Decree by DHA; one of these was the failure to assign tenants to West Dallas, the subject of the Feb. 9, 1987 motion.

**13.** The resolved matters were embodied in agreed orders entered on Feb. 19, 1988 and March 25, 1988.

**14.** The matters raised by this motion are resolved in the opinion in *"Walker III: Joinder of the City of Dallas as a Defendant Subject to the Consent Decree."*

**15.** These motions are the subject of *"Walker II: The Frost Amendment and the Anti–Demolition Statute."*

**16.** In making the findings of fact in this opinion and in *Walker II* and *Walker III,* this Court has judged the credibility of each witness. In this regard, the Court credits the testimony of Mary Dews, Craig Gardner, John Schoellkopf, Lori Palmer, and Harry Jones at each hearing where they testified; it discounts the testimony of Gerald Wilhite, Robert Detchin, and David Morton at the March 25, 1988 Hearing, and the testimony of Charles Crane at the Dec. 12, 1988 Hear-

#### 1. Tenant Selection & Assignment

The Consent Decree provided that, within thirty (30) days of the date of the Decree (Jan. 20, 1987), DHA was to adopt and implement a "one offer, one refusal tenant selection and assignment plan" that:

"... will include a single waiting list from which applicants will be chosen to fill vacancies at any of DHA's LRPH projects, § 8 New Construction and § 8 Substantial Rehabilitation projects. The TS & A plan will include procedures for effective monitoring of DHA staff compliance with the TS & A procedures...." (Decree Plan III 7, 13)

This simple—but very important[17]—task was not completed by February 20, 1987. Instead, because DHA had done little, if any, work on the preparation of this plan before approval of the Consent Decree,[18] the initial plan was not even presented to HUD until April 17, 1987. However, this two-month late plan was defective and actually it violated the Decree in several ways:

(i) it did not provide the internal monitoring of DHA staff compliance (Decree Plan III, 13);

(ii) it did not provide that those refusing offers had to go to the bottom of the waiting list, as required by the Decree (Decree Plan III, 7); and

(iii) it used an erroneous method to determine if DHA projects were impacted or non-impacted.[19]

The plaintiffs objected to this initial Tenant Selection & Assignment plan in their July 1, 1987 Motion to Enforce Consent Decree. The dispute was eventually settled, and a satisfactory plan was implemented—*but well beyond the February 20, 1987 deadline.*[20]

#### 2. Housing Mobility Requirements

The Consent Decree required DHA to establish a new Housing Mobility Division to be responsible for a wide range of functions[21] aimed at providing desegregated § 8 housing opportunities for class members throughout Dallas and its suburbs:

"A new Housing Mobility Division will be established for the purposes previously described. The division will be headed by a staff person at the Assistant Director level, with a minimum of five other staff persons (one real estate outreach person, three counselors and one clerical person)....

"All current and future participants in the Section 8 existing and voucher program will be notified of DHA's Housing Mobility Unit and the availability of couns- 'ing and referral services to assist any ᵣ 'tificate or voucher holder who wishes to locate alternative housing in areas where his or her race does not predominate...." (Decree Plan, Summary 2, III 5 and 3).

DHA violated these Housing Mobility Requirements in several distinct ways: its

ing, because they were not credible witnesses; and, it credits the testimony of all other witnesses at these hearings only to the extent that the testimony does not conflict with the findings of fact in this opinion (and in the *Walker II* and *Walker III* opinions).

**17.** Proper tenant assignment and selection plans are critical in any decree that attempts to remedy segregation in public housing; they afford protection against manipulation of the waiting lists and make it easier to monitor tenant assignments that may perpetuate racial segregation.

**18.** In contrast, on Nov. 5, 1986—over one month before the fairness hearing on the Consent Decree—DHA had requested funding from the City of Dallas for the Housing Mobility Division and the West Dallas relocation benefits.

**19.** Under the initial plan, DHA took the city-wide average and applied it to each project, instead of using the eligible population; because of this, some DHA projects which were predominately white were actually treated as minority units.

**20.** The DHA First Annual Report, p. 65 (Jan. 20, 1988), indicates that the Tenant Selection & Assignment Procedures were implemented on June 29, 1987, but revised on Dec. 17, 1987 (*just prior to the Dec. 21, 1987 hearing*).

**21.** These included recruitment of "owners of private rental housing" in non-impacted areas to participate in the § 8 program, assisting and counseling with families who desire § 8 housing, and assisting in "tenant relocation programs" under the Decree. (Decree Plan, Summary 2).

delay in establishing the Mobility Division; its failure to provide adequate resources to perform the Decree's Mobility Requirements; its failure to provide correct information about the program to those interested in § 8 housing; and its delay in providing mobility services to those who did not live in West Dallas project.

### (i) Delay in Establishment of the Housing Mobility Division

DHA first delayed the creation of the Mobility Division while it tried to obtain funding for this program from the City of Dallas. The first DHA request to the City was made on November 5, 1986—over two months before the Decree was approved—but the DHA Executive Director made additional attempts to obtain mobility funding from the City Council on March 3, 1987; on March 11, 1987; and on March 18, 1987.

Finally, on March 18—almost two months after approval of the Consent Decree—the Dallas City Council refused the DHA request. Instead, it approved "an offer for a 7.5% loan to DHA for funding relocation payments, provided that available DHA funds from the settlement of a lead contamination law suit are expended first." [22] Because of this delay, the Housing Mobility Division was not put into operation until sometime in April of 1987, when DHA finally hired the Assistant Director for Housing Mobility and the five other staff persons required by the Decree.

*There was no excuse for this delay.* DHA had other means of funding the Mobility Program besides obtaining money from the City of Dallas. For example, DHA could have obtained the approval of HUD—*before January 20, 1987*, when the Decree was approved—for the use of the settlement proceeds from the lead contamination litigation for the funding of the Mobility Requirements.[23] In addition, DHA had other available sources for funding its obligations under the Consent Decree.[24]

### (ii) Failure to Provide Adequate Resources

When it was finally established, the Housing Mobility Division had the *minimum* six-person staff required by the Decree. The Assistant Director was *Craig Gardner*, who headed the Mobility Division from April 1987 through October 18, 1988.

On February 1, 1988, DHA reorganized its basic § 8 program and its Mobility Division. They were both put under a new "Housing Placement & Mobility" department with two divisions: Housing Opportunity & Mobility Expansion (HOME) and Landlord Services. According to Craig Gardner, this had a dramatic effect on the resources available for mobility services; Gardner and his five staff persons were responsible for the basic § 8 program as well as mobility services—and, after February 1, 1988, Gardner was able to spend only 40% of his time on the Mobility Requirements of the Decree.[25] Indeed, the reason given to Gardner for this reorganization was that "the Mobility Division was costing [DHA] a lot more money than it thought."

---

**22.** The City's offer of this "loan" was worthless. See *Walker III*, at fn. 71.

**23.** In fact, on March 5, 1987, DHA asked HUD for approval to use the lead settlement funds for mobility and relocation costs under the Decree—and, in only five days, HUD granted this request on March 10, 1987. DHA First Annual Report, pp. 35–36 (Jan. 20, 1988).

**24.** At the March 25, 1988 Hearing, DHA's attorney advised the Court of these other possibilities for funding: (i) proceeds from the sale of *Washington Place;* (ii) the *Lake West* Settlement Fund; (iii) the *Mustang Village* Fund; and (iv) obtaining a loan using vacant DHA land as collateral. At the Sept. 18, 1987 Hearing, a letter from DHA Executive Director Jack Her-rington to a HUD attorney, showed the amounts supposedly available to DHA at that time: (i) *Washington Place* Sale—$9.1 million; (ii) *Lake West* Settlement—$684,000; and (iii) *Mustang Village* Fund—$130,000.

**25.** Contrary testimony was given by other DHA employees—including David Morton, DHA Deputy Executive Director and Charles Crane, DHA Acting Executive Director—at the March 25 and Dec. 12, 1988 Hearings. The Court discounts this testimony because it was not credible; in contrast, Craig Gardner's testimony was very credible—both at the March 25, 1988 Hearing (when he was a DHA employee) and at the December 12, 1988 Hearing (after he had been fired by DHA Acting Executive Director Charles Crane).

This reorganization, in itself, violated the Consent Decree.

*In addition, at no time did DHA provide adequate resources for the Mobility Requirements of the Decree.* Craig Gardner testified that they just did not have the staff to provide mobility services for everyone who needed it—even though DHA had the finances to do so. This was confirmed by the testimony of Mary Dews, a class member who had regular contacts with the DHA mobility staff in her capacity as a counselor for the Dallas Tenants Association.[26] In contrast, Acting Executive Director Charles Crane testified that DHA had a proper mobility program—even though he did not know the names of any of the counselors and did not know how much time each mobility counselor was required to spend on DHA's basic § 8 program.[27]

Crane's testimony (about the adequacy of the Mobility Division) was not credible because it contradicted the facts, the exhibits taken from DHA records, and the testimony of credible witnesses (such as Gardner and Dews). Moreover, on October 18, 1988, Crane—as Acting Executive Director of DHA—gutted the Mobility Division by firing Craig Gardner and three other members of the original mobility team.

Crane attempted to justify the firing of Gardner on the basis of poor performance. Yet, he simply ignored the fact that—under adverse conditions and with inadequate resources—Gardner and his staff had managed to move a number of black families into suburbs and non-impacted areas in Dallas under the Decree. Indeed, Gardner's ability and potential was one of the very few things that the plaintiffs *did not* criticize in monitoring DHA's performance under the Decree:

"On the bright side, the person chosen by DHA (albeit tardily) to head the HMD (Home Mobility Division), Craig Gardner, impresses plaintiffs as capable, realistic, and independent. He seems committed to the goals of the decree as a whole and the successful implementation of those goals by the HMD. *If given the necessary resources to do the job,* Mr. Gardner should be able to make the HMD the instrument of significant change in housing opportunities for class members envisioned by the Decree and Plan." [28]

Finally, the actual assistance being provided by DHA demonstrates that adequate resources were not being provided for mobility services. In particular:

(i) the primary service provided by the DHA Mobility Division was a bus tour of available § 8 housing in non-impacted areas;

(ii) no transportation was provided for persons who needed to return for follow-up visits (for signing leases, additional inspections, etc.);

(iii) very often people did not receive briefing sessions which they needed in order to make informed choices about the use of § 8 certificates and vouchers;

(iv) DHA did not even have a correct list of vacancies in non-impacted areas; for some time, tenants were given two lists—one of landlords willing to participate in the § 8 program and one of landlords barred from the program—and they were supposed to be sophisticated enough to check the lists against each other;

(v) just weeks before the March 25, 1988 Hearing, Mary Dews asked for a current list of available vacancies in non-impacted areas; there was still no such list—over 14 months after the Consent

---

**26.** Dews also testified that people had trouble "getting through" on the phone to their case workers. This was confirmed by David Morton, Deputy Executive Director of DHA, at the March 28, 1988 Hearing—and Morton also testified that DHA had finally come up with a way to deal with this problem, over one year after the Decree became effective. According to the DHA First Semi–Annual Report, p. 9 (July 20, 1988), DHA established a "Tenant Hotline" on April 27, 1988.

**27.** On Oct. 14, 1988, Jack Herrington resigned as Executive Director, and Charles Crane was named Acting Executive Director. DHA Second Semi–Annual Report, p. 3 (Jan. 20, 1989).

**28.** Plaintiffs' Response to DHA Report No. 1, p. 12 (May 12, 1987).

Decree was approved—so Craig Gardner's secretary "pasted one together" for Ms. Dews; and

(vi) during a one-year period before March 1988, some 196 DHA § 8 tenants had their contracts abated and because the units did not meet Housing Quality Standards—but no mobility services were provided for any of these because the Mobility Division simply did not have the staff to do so.

### (iii) Failure to Provide Correct Information

The Mobility Division even gave incorrect information to persons who wanted to use the § 8 program. For example:

(i) the § 8 "briefing packet" used by DHA contains a document—"§ 8/Your Responsibility As A Tenant on Rent Assistance"—which states that, *if tenants choose to move*, they will be dropped from the § 8 programs, but that they can reapply and wait several months before they can receive § 8 assistance in a new unit. *This is not correct;* indeed, the Decree requires DHA to notify all § 8 participants "they can move to another dwelling upon completion of one year's tenancy under their lease" and still receive the § 8 assistance. (Decree Plan III, 2).

(ii) A DHA brochure states that counselors will be glad to check to see if § 8 participants are eligible for mobility services. This is misleading because, under the Decree, all § 8 participants are automatically eligible for mobility services.

More significantly, the Decree requires that DHA give notice to § 8 participants that housing is available in "all cities located in whole or in part in Dallas County and the City of Plano." (Consent Decree E, Exh. A). Yet, the "checklists" used by DHA for the preparation of the § 8 "briefing packets" *do not* require the inclusion of this notice—and, contrary to the testimony of DHA employees, it appears that not all of these packets contained the Exhibit A notice required by the Decree. Moreover, the § 8 packets actually contained a document which expressly contradicted the Ex-

hibit A notice of increased mobility, by stating:

"Any type of existing rental housing *located within the City of Dallas* is eligible, provided ... the dwelling unit conforms to the minimum housing codes established *by the City of Dallas* ... Eligible renters are free to locate a rental unit of their choice anywhere *within the city limits* " (emphasis added).

During the week before the March 28, 1988 hearing—some 14 months after the Consent Decree was approved—DHA learned *from the plaintiffs* that it had been violating the Decree's requirement for the Exhibit A notice. Accordingly, it revised the document to reflect that § 8 housing is available in "the City of Dallas any suburban city wholly or partly in Dallas County and the City of Plano"—*just in time to introduce the revised version on March 28, 1988 through the testimony of David Morton, DHA Deputy Executive Director.* Needless to say, this belated correction of misleading information was a violation of the Decree's requirement that all policy and procedure manuals and other documents had to be revised within ninety (90) days after January 20, 1987. (Consent Decree 3, D).

### (iv) Delay in Providing Mobility Services

When the Housing Mobility Division was finally established in April of 1987, it concentrated on providing mobility services to the tenants located in West Dallas. Because of this, it did not provide mobility services for (i) those who were in other DHA projects, or (ii) those who were participating in the basic § 8 program of DHA, or (iii) those § 8 tenants who were forced to move because their landlords did not correct violations of the Housing Quality Standards.

Nor did persons in the basic § 8 program receive any mobility services from the DHA staff handling that program. Instead, DHA Deputy Executive Director David Morton instructed the § 8 staff that they were not to provide *any* mobility services—because this was the responsibility of the separate Housing Mobility Division.

Morton also gave specific instructions to the § 8 staff:

> ... that he did not want the goals of the mobility program to alter or to impact a neighborhood or project;
>
> ... that he generally felt that there should be a limit of ten § 8 tenants in any apartment project in a non-impacted area;
>
> ... but that he was open to the idea that occupancy of 5% of the total units in a complex by § 8 tenants would have not adverse impact in that particular project.

These instructions by Morton were, in themselves,[29] violations of the Consent Decree. Because of them, the § 8 staff referred only 61 persons to the Housing Mobility Division during 1987. Finally, on February 10, 1988, mobility services—albeit those of the nature described above—were begun for DHA tenants and § 8 participants outside of West Dallas.

This delay in providing mobility services to those outside of West Dallas had a dramatic, adverse effect upon the Consent Decree's goal of giving everyone a choice to move to housing in non-impacted areas. For example, during the first year of the Decree:

> (i) Some 68%—134 out of 196—of West Dallas residents relocating with § 8 assistance were, *with mobility services,* able to find housing in non-impacted areas;
>
> (ii) But only 26%—29 out of 111—of the § 8 participants who relocated because of Housing Quality Standard problems, *without mobility services,* were able to find housing in non-impacted areas.

Indeed, even David Morton, DHA's Deputy Executive Director, conceded that the furnishing of mobility services would cause a tremendous increase in relocation DHA tenants to non-impacted areas.

Therefore, it is clear that DHA violated the Mobility Requirements of the Decree—primarily by its delay in providing mobility services and by its refusal to commit adequate resources to meet its obligations under the Decree.

### 3. 120% Fair Market Rent Exceptions

Under its regulations governing the § 8 program, HUD can approve the payment of 120% of the "fair market rent" if this is necessary to provide an adequate supply of § 8 housing opportunities in non-impacted areas. In negotiating the decree, the parties—at least the plaintiffs and DHA—recognized that it would be difficult, if not impossible, to obtain an adequate number of § 8 assisted units in non-impacted areas of Dallas and its suburbs without this 120% exception. Therefore, the Consent Decree provided that:

> "DHA will promptly submit a request for HUD approval of 120% FMR exception rents for those areas of metropolitan Dallas in which reasonable rents exceed the published FMRs." (Decree Plan III, 10).

DHA violated this provision of the Decree. No request for a 120% rent exception was even presented to HUD by DHA until April 23—over three months after the approval of the Decree. HUD rejected this request on May 26, 1987, so DHA submitted a second request on June 5, 1987, stating that "120% rents are fully justified and absolutely essential to Consent Decree implementation." Finally, after DHA submitted additional supporting material,[30] HUD did approve the use of the 120% rent exception for § 8 certificates in Dallas and its suburbs on July 23, 1987—*six months after approval of the Consent Decree.*

However, this exception applied only to the 450 § *certificates* which DHA had received from HUD under the Decree. And, HUD took the position that—because of a change in HUD guidelines concerning max-

---

**29.** There was no similar restriction on the number of § 8 tenants in an apartment complex in a minority or impacted area.

**30.** This additional material included a rent survey by DHA which showed that § 8 certificates

could not be used to accomplish the decree's goal of providing expanded housing opportunities in non-impacted areas without the 120% rent exception.

imum rent levels for § 8 *vouchers* (which had taken place between the approval of the Consent Decree and the July 23, 1987 approval of the 120% rent exception for § 8 *certificates*)—no similar exception could be granted for the 885 § 8 *vouchers* which had been allocated to DHA under the Decree.

The practical effect of this decision by HUD was to make the § 8 vouchers almost worthless for use in moving people out of minority and low-income impacted areas under the Decree. Specifically:

> (i) the cost to someone using a § 8 voucher in a non-impacted area would be substantially more than using that voucher in a minority area; and

> (ii) someone using a § 8 *voucher* in a non-impacted area would generally pay substantially more rent than a § 8 *certificate* tenant in that same area.[31]

Both the plaintiffs and DHA agreed this meant that § 8 tenants who got *vouchers* would be forced to remain in minority areas—and that, in general, only § 8 tenants with *certificates* and the *120% rent exception* could move into a non-impacted area.[32]

Faced with this serious problem, in their February 8, 1988 motion, the plaintiffs sought an order which would (i) set a payment standard for § 8 vouchers at 120% of the fair market rent levels, and (ii) provide retroactive relief "for the few class members currently receiving the voucher assistance." HUD opposed this motion, and evidence concerning the problem was presented at the March 25, 1988 Hearing.

The parties continued to negotiate to resolve this dispute. Finally, on August 31,

---

**31.** For example, a § 8 *certificate* tenant in a non-impacted area would not have to pay more than 30% of adjusted income in rent and utility expense; however, a § 8 *voucher* tenant in the same non-impacted area could be required to pay from 33⅓% to 95.56% of gross income for rent and utilities.

**32.** In its First Annual Report, pp. 18–19 (Jan. 20, 1988), DHA stated that this refusal of a 120% rent exemption for vouchers would "discourage participants from relocating in non-impacted areas" and "will present problems in the long term implementation of the Consent Decree."

**33.** Because of its violations of the Decree's requirements concerning the 120% Fair Market

1988, HUD reversed its position—and gave DHA permission to use the 120% exception on § 8 vouchers. Incredibly, despite its repeated statements that persons who had § 8 vouchers would be forced to choose housing in impacted areas without the 120% exception, *DHA simply refused to use this 120% rent exception for § 8 vouchers.* And, the December 12, 1988 Hearing, DHA Acting Executive Director Charles Crane testified:

> (i) that DHA had taken no steps to implement the increase in § 8 voucher payments, and planned to do that only "if we're failing to meet our goals of fulfilling the Consent Decree requirements of the percentages of people that need to be in non-impacted areas"; and

> (ii) that DHA had no plans to allow people who were hurt by the lack of 120% rent exception for vouchers to switch to § 8 certificates, and that DHA would only do this if ordered to do so by the Court.

This blatant violation of the Consent Decree by DHA was finally resolved by an agreed order on January 4, 1989, in which DHA agreed to implement the 120% rent exception for § 8 vouchers—over four months after that exception was approved by HUD.[33]

### 4. 15% Goal for § 8 Units In Non–Impacted Areas

The Consent Decree required DHA to use the § 8 program to move persons in need of low-income housing outside of minority or impacted areas. Specifically, the Decree provided that DHA would:

> Rent Exceptions, DHA is liable for the retroactive relief sought by the plaintiffs' Feb. 8, 1988 motion—for those class members who paid excessive amounts under their § 8 vouchers. Although this problem was initially caused by HUD's refusal of the 120% rent exception for vouchers, once HUD changed its position on August 31, 1988, DHA refused to implement this much-needed exception—and probably would not have done so by January 4, 1989, but for the incredible testimony given by its Acting Executive Director at the December 12, 1988 Hearing. Therefore, the retroactive relief should be paid solely by DHA.

"... use every good faith effort to locate a substantial percentage of its § 8 certificate or voucher units outside census tracts in which there are currently 10 or more § 8 certificates in use." (Decree Plan III, 12–A).

At the end of the first year of the Decree, DHA was required to have 15% of its § 8 units in use in non-impacted areas. (Decree Plan III, 12–A).[34]

DHA violated the Decree by failing to meet this 15% goal by January 20, 1988, the end of the first Decree year. In particular:

(i) DHA had approximately 5,200 § 8 certificates and vouchers allocated to it by HUD;

(ii) as of January 20, 1988, only 636 of these were located in non-impacted areas; and

(iii) these 636 units were only 12.2% of the § 8 certificates and vouchers allocated to DHA.

This first year goal of 15% was modest; and DHA's failure to meet it is even more egregious since there were already 267 § 8 units located in non-impacted areas when the Consent Decree was approved.

DHA's attempt to justify this violation by contending that the 15% should be applied to the number of § 8 units it had *in use* on January 20, 1988 (i.e., 3,612)—not to the 5,200 § 8 units allocated to DHA—is simply wrong. The Decree does not provide this; and, to construe it in that manner would be inconsistent with the intent of the Decree to give as many people as possible the choice of moving to non-impacted areas—and would reward DHA for reducing the number of § 8 certificates and vouchers which it had in actual use.

In fact, that is just what DHA did during the first Decree year. Specifically:

(i) there were *3,743* § 8 certificates and vouchers in use on January 31, 1987;[35] but

(ii) DHA had only *3,667* vouchers and certificates in use on January 31, 1988.

Before the Consent Decree, DHA had no problem utilizing *all* of the § 8 units allocated to it. Indeed, under HUD regulations, unless DHA proceeds expeditiously to achieve 100% utilization of its § 8 allocations, HUD may reduce the number of § 8 units allocated to DHA. However, during the first year of the Consent Decree, DHA severely limited the § 8 program by failing to use over 30% of the 5,200 certificates and vouchers which it had. Specifically:

(i) in September of 1986, DHA simply closed its § 8 program for any new applications—for the professed reason that the program "was substantially overleased";

(ii) this supposed overleasing problem was corrected by July or August of 1987, but the § 8 program was not reopened—and this resulted in a severe drop in the number of § 8 units in use;[36] and

(iii) the § 8 program was finally reopened in December of 1987, after being closed for some 15 months—and this resulted in some 2000 interviews of persons applying for § 8 assistance being scheduled during December 1987 and January 1988.[37]

Because of these things, there were fewer § 8 units in use at the end of the first Decree year than there were where the Consent Decree was approved—*and DHA had over 1500 certificates and vouchers*

---

**34.** Under the Decree, 30% of the § 8 units were to be located in non-impacted areas at the end of the second Decree year—and 50% of the § 8 units were to be in use in non-impacted areas at the end of the third Decree year. (Decree Plan III, 12–A).

**35.** DHA's First Annual Report (Jan. 20, 1988) gave the figure of 3,690 for certificates and vouchers in use as of the initial decree month. DHA's First Semi–Annual Report (July 20, 1988) indicates that the initial decree month figure was 3,743.

**36.** Tony Rios, DHA Director of Housing Applications & Eligibility, protested about this decision to keep the § 8 program closed—but to no avail.

**37.** Morton's attempted justification for this decision—that DHA was trying to meet the Decree's requirements concerning relocation of persons from West Dallas and other DHA projects—would (even if true) simply demonstrate again the failure of DHA to commit adequate resources to the Consent Decree.

*which were not in use on January 20, 1988.*

DHA does contend that "restrictions" in the Consent Decree—reserving some of the § 8 units for the tenants in West Dallas to be relocated—was responsible for the "under-utilization" of § 8 vouchers and certificates. This argument is baseless, as demonstrated by what DHA did in the § 8 program (under the same restrictions) in the period just before the March 25, 1988 Hearing:

(i) on January 5, 1988, DHA had *636* § 8 units located in non-impacted areas;

(ii) but on March 21, 1988, there were *885* vouchers and certificates in use in non-impacted areas—an increase of 249 units in only 2½ months;

(iii) during the first 21 days of March 1988, just prior to the hearing, DHA was able to place *87 families* in non-impacted areas by the use of § 8 certificates and vouchers.[38]

DHA also made an effort to show that there were only 26 unused § 8 units at the end of the first Decree year, instead of over 1500. The evidence offered on this point was totally unconvincing and contrary to the facts. It was also contradicted by the testimony of the DHA Executive Director, Jack Herrington, that *he "would like to see more [§ 8] units in use"* and would like "to see more tenants move into non-impacted areas" with § 8 vouchers and certificates.

The Decree obligated DHA to "use every good faith effort" to move tenants into non-impacted areas with the use of § 8 vouchers and certificates. In violation of this provision, DHA did not meet the 15% goal for the first Decree year.[39] In addi-

tion, because of the cessation of the § 8 program for some 15 months, the net results of DHA's efforts over *the first 14 months* of the Consent Decree was that an additional 153 § 8 certificates and vouchers had been placed in use.[40]

5. Housing Quality Standards & Inspections

Under the Consent Decree, DHA is required "to assure that Housing Quality Standards ('HQS') are enforced in all § 8 existing certificate and voucher units and in the new units secured by the Housing Mobility Division." (Decree Plan III, 1). DHA violated these Housing Quality Standards and Inspection requirements in several different ways.

In July of 1987—six months after the Consent Decree was approved—DHA was still "knowingly leasing units that did not meet Housing Quality Standards."[41] And in March of 1988, DHA still did not have a list of vacancies of approved landlords in non-impacted areas; instead, it gave two lists to prospective § 8 tenants—one of landlords willing to participate in the program and one of landlords barred from the program (for HSQ problems and other reasons)—and the tenants were supposed to be sophisticated enough to check the lists against each other.

The Decree requires DHA to request code enforcement from the appropriate city when a unit is found to be in violation of Housing Quality Standards. (Decree Plan III, 1–A). However, DHA has no records of any requests for code enforcement until July of 1987—when there were 9 requests—even though:

---

**38.** At the end of the first Decree year, the total number of families receiving either public housing or § 8 assistance from DHA declined from 9,161 to 8,471.

**39.** In contrast, at the end of the second Decree year, DHA had 5,233 § 8 units in use, and 2108 of these (some 40%) were in non-impacted areas (DHA Second Annual Report, Appendix 1)—and on June 30, 1989, DHA had 5,435 § 8 units in use, and 2465 of these (some 45%) were in non-impacted areas (DHA Report # 7, Appendix 1).

**40.** On January 20, 1987, there were 3,627 § 8 units in use; on March 21, there were 3,860 vouchers and certificates in use—*with over half of the increase of 153 units taking place in the three weeks before the March 25, 1988 Hearing.*

**41.** March 25, 1988 Hearing: Pls.Exh. 17 (July 20, 1987 letter to DHA from HUD); Testimony of Jack Herrington (Tr. 52).

... 58% of the units already receiving assistance failed the annual reinspection;

... 41% of the units submitted for first-time § 8 *certificate* assistance failed the first HQS inspection;

... 53% of the units submitted for first-time § 8 *voucher* assistance failed the first HQS inspection; and

... 15% of the 3600 units receiving assistance were placed on abatement, from January 20, 1987 and March 3, 1988, because landlords would not timely repair conditions which violated Housing Quality Standards.

Then, in early August 1987, DHA Deputy Executive Director David Morton gave written instructions that "minor HQS violations" were not to be sent to the City of Dallas. Incredibly, this was interpreted by the DHA § 8 staff to mean that—contrary to the Consent Decree—*they were not to request any code enforcement from Dallas.* Even more incredible, this resulted in a 7–8 month period (from August 1987 to April 1988) in which DHA sent no code enforcement requests to the City of Dallas—*and no DHA supervisor ever realized that the Decree was being violated in this manner.*[42] But "incredible" is not strong enough to describe what happened next; even though DHA learned of this blatant violation of the Decree at the March 25, 1988 Hearing:

(i) a computer program set up in April 1988 to generate an automatic letter-request for code enforcement to the appropriate city *was never used*—because Charlene Elder, the Assistant Director of the § 8 program, "believed that DHA was not going to do business with those landlords"; and

(ii) although DHA did begin to send code enforcement letters to Dallas in April 1988, it never asked for code enforcement on any of the housing units that had failed HQS inspections during the August 1987–March 1988 period.

Finally, there were other violations of the HQS requirements: tenants could not "get through" to their DHA case workers to report problems with Housing Quality Standards; DHA failed to give the City of Dallas notice as to which particular units were to be inspected;[43] and DHA never did any "follow-up with the city" to see what had happened with respect to the code enforcement requests.[44]

### 6. The 100 Units of New Public Housing

The Consent Decree provided for the construction of 100 units of low rent public housing ("LRPH")—the first new public housing to be constructed in Dallas since the West Dallas project in the 1950's. A specific schedule was set for these 100 units:

"DHA will move without delay to develop the 100 LRPH units that are part of the 1000 units committed by HUD herein.

"(A). These units shall be located in non-racially impacted areas pursuant to HUD's site-selection regulations.

"(B). DHA will select sites within six (6) months of the date of this decree, begin construction of the units within fifteen (15) months of the Decree and begin initial occupancy of the units within twenty-four (24) months of the Decree. If it appears that DHA will be unable to meet any of these deadlines, DHA will give notice of such inability to the court and state the reasons for the delay." (Decree Plan III, 10).

DHA violated the Consent Decree because it did not meet a single one of the deadlines

---

**42.** David Morton, who gave the instructions about "minor violations" in August 1987, testified that he did not learn about this until the March 25, 1988 Hearing—but he attributed the entire fault for this Decree violation to his staff "who didn't follow through."

**43.** Harry Jones, Dallas Assistant City Manager, testified that, as of December 12, 1988, DHA had still not notified the City of the units "DHA wanted inspected in December"—even though the City was averaging 500 inspections a month for DHA.

**44.** Perhaps as a result of this, of the 479 units on which DHA requested code enforcement from April–October 1988, the City of Dallas opened code enforcement files on only 180 of these requests.

established for the development of the 100 units.

### (i) Site Selection: July 20, 1987

The site for the 100 units was not selected until September 18, 1987—and this was done by the Court, not by DHA.

Despite the neighborhood opposition and political pressure, which DHA knew it would receive about the location of these 100 units, DHA did not use eminent domain to select the site.[45] Instead, on March 4, 1987, it advertised for bids for a contractor to develop the 100 LRPH units on "scattered sites." The three proposals DHA received were unacceptable so, on April 17 and April 26, 1987, it advertised for bids on the construction of the 100 units both on scattered sites and "for all units on a single site."

On June 10, 1987, DHA received 16 proposals from five developers for the 100 new units. Then, on July 10, 1987—just ten days before the deadline for the site selection—the DHA Board heard the staff's recommendations on these proposals, and then "authorized the staff to schedule a public hearing on a site in Southeast Dallas." And, on July 21, 1987, DHA dropped consideration of this location because it learned of "an unrecorded deed restriction" which would preclude the construction of the 100 units of LRPH.

On August 4, 1987, DHA turned its attention to a 11.5 acre site known as *"Country Creek."* Despite the fact that political pressures had caused DHA to drop the consideration of *Country Creek* for the *Washington Place* replacement units,[46] DHA assured further delay by scheduling a public hearing on September 15, 1987 concerning the construction of the 100

units of new public housing at the *Country Creek* site. Not surprisingly, "the overwhelming majority" of the 300 people in attendance "strongly opposed the development"—as did the Chairman of D.I.S.D. and the Mayor of Dallas.[47]

On September 10, 1987, the plaintiffs moved to compel the site selection for the 100 units. On September 19, 1987, after hearing the evidence—and learning that *Country Creek* was the only available, acceptable location for the 100 units—the Court directed that DHA select this site:

"... It's obvious that the neighborhoods we've talked about, the alternative sites don't want public housing in their area. *Indeed, probably no one wants public housing in their area.* The *Seagoville* site, which was the No. 1 choice, was opposed, just like the *Country Creek* area was opposed, and just like I am sure that the *Highland* area would be opposed, just like the *East Dallas* site was opposed, just like the five scattered sites to replace *Washington Place* were opposed.

" ...

"I have no confidence that any delay would do anything but just that, be another delay. The site [*Country Creek*] would not be my first choice, but it is an acceptable site. It does meet the requirements of HUD; it complies with the City of Dallas requirements; it does have a money problem but that needs to be resolved.

"I am going to specifically order that the Dallas Housing Authority select the *Country Creek* site and that they meet the schedule in the Consent Decree, and that's to have those units constructed

**45.** See the "Not In My Neighborhood" discussions, Chapters One–Five, in the *Walker III* opinion. In the past, DHA has not hesitated to use *eminent domain when acquiring property for its* black projects, including the West Dallas project. See *Miers v. Housing Authority of the City of Dallas,* 266 S.W.2d 487 (Tex.1954); *Housing Authority of the City of Dallas v. Higginbotham,* 135 Tex. 158, 143 S.W.2d 79, 95 (1940).

**46.** DHA actually selected the *Country Creek* site in 1986 for the development of 106 *Washington*

*Place* replacement units, but changed this decision because of neighborhood opposition and local political pressure. See the *Walker III* opinion.

**47.** *Consistency is certainly not a requirement in opposing public housing.* Some opposed the 100 units at Country Creek because this was "too large a project for public housing"—while, at the same time, they opposed demolition of even the 1200 units at the 3500–unit West Dallas project that had been vacant and uninhabitable for over 10 years. See the *Walker III* opinion.

and operating within two years from the date of the settlement. That means by January 20, 1989.[48] ... However, so we can all understand, I will not accept any excuses to the schedule which is in this order. The construction will begin within 15 months. That's April 20, 1988. Initial occupancy of these units will begin by January 20, 1989. And if those are not met *I will hold Dallas Housing Authority in contempt and I will impose sizable fines per day until those are complied with.*" (Sept. 18, 1987 Transcript, Rulings of the Court pp. 1, 3–4).

### (ii) Construction: April 20, 1988

DHA violated the second deadline by not beginning construction on the 100 units of LRPH by April 20, 1988. However, HUD was at least partly at fault for this violation.

On October 13, 1987, DHA completed its plan for the 100 new units and submitted it to HUD for approval. HUD did not approve this proposal before the end of 1987. Then, after the "Frost Amendment" was passed,[49] HUD began to insist that DHA give HUD a "firm commitment" that only non-federal funds would be used for the demolition of 100 units at West Dallas—which, under the Consent Decree, could be demolished after the construction of the 100 new LRPH units at *Country Creek.*

There is an unresolved dispute between HUD and DHA as to whether—and when—this "firm commitment" was given. However, at the March 25, 1988 Hearing, this Court ordered HUD to approve DHA's proposal for the 100 units at the Country Creek site:

"... you all were here when I pointedly told DHA that unless this project was begun on April 20 and occupancy started on January 20 of next year that I would impose sanctions. I still intend to do so. I'm going to give HUD until the end of

next week to approve this [*Country Creek* project]. If they don't then I will enter an order.

"... I am not going to impose sanctions at this time. I need to find out when construction starts. I need to find out how much the dates are missed by.... I'll reserve the imposition of sanctions against DHA and HUD until I can see actually what happens. I'll reserve DHA's request to tax HUD with any additional expenses until I see what happens. I'll reserve ruling on attorney's fees."

HUD approved the DHA proposal for the Country Creek 100 units on April 1, 1988, and approved the final plans and specifications for this project on May 25, 1988. Finally, on September 1, 1988—4 months and 10 days after the second Decree deadline—"construction began on the one hundred units of public housing on Country Creek Drive."

### (iii) Initial Occupancy: Jan. 20, 1989

DHA violated the Decree because "initial occupancy" of the 100 new units at Country Creek did not begin on January 20, 1989.

On January 19, 1989, the DHA attorney gave notice that this deadline would not be met. Construction is still continuing in July of 1989. DHA currently estimates that construction of the 100 units will be completed in August of 1989, and that initial occupancy will begin during that month—approximately *8 months* after the deadline set in the Consent Decree.

### 7. Additional Violations

There were also several additional violations of the Consent Decree by DHA. Specifically:

(i) *Assignments to West Dallas*—The July 1, 1987 motion filed by the plaintiffs attacked the DHA policy of refusing to

---

**48.** In the transcript of the Sept. 18, 1987 Hearing, this date (and two others) appear as *"July 20, 1989."* This was an obvious mistake since the Decree required that the 100 units be ready for *initial occupancy* within 24 months from January 20, 1987.

**49.** The "Frost amendment," passed on Dec. 22, 1987, purported to prohibit the use of any HUD funds for the demolition of housing units at West Dallas. Public Law 100–202, 101 Stat. 1329–213. But see this Court's opinion in *Walker II.*

assign any new tenants to the West Dallas project. At the December 21, 1987 Hearing, the Court held this was a violation of the Decree's provision that "any proposal to sell or otherwise remove from the housing inventory of DHA any housing units ... will be submitted to the Court for approval to insure that such action will not interfere with implementation of the Decree and Plan." (Consent Decree, 8). After that hearing, DHA again started making tenant assignments to West Dallas.[50]

(ii) *§ 8 Waiting List*—Under the Plan, tenants in projects other than West Dallas were to have 60 days to respond to the DHA notice that they had the opportunity to use the § 8 program. (Decree Plan II, B–C). Approximately 500 families responded within this period, and they should have been placed at the top of the § 8 waiting list. However, DHA sent each tenant a second notice requiring them to submit another response within 14 days. This second response was a violation of the Decree because some class members who did not respond to the second notice were deleted from the § 8 waiting list.[51]

(iii) *One–For–One–Replacement*—The Decree requires a one-for-one replacement by a § 8 certificate or voucher for every unit demolished in West Dallas. The plaintiffs have repeatedly objected that the 1,335 § 8 vouchers and certificates allocated to DHA by HUD are not "one-for-one replacements." Specifically, they claim

> ... that the § 8 allocation proposes to use one and two bedroom units to justify the demolition of 3, 4, 5 and 6 bedroom units; and

> ... that DHA even reduced the number of 3–bedroom § 8 units by increasing the number of 1 and 2 bedroom § 8 units.

The plaintiff's have objected to any demolition (and to DHA's proposed demolition plan for West Dallas) on this basis. Although the Court has only expressed its

opinion informally—since the DHA and HUD positions on this issue have changed at various times—it is clear that the plaintiffs are correct on this issue.

(iv) *Other Matters*—The plaintiffs have charged DHA with other violations of the Consent Decree; these involved such things as the adequacy of the initial DHA reports under the Decree, the identification of residents of predominately black elderly occupied projects for remedial offers under the Consent Decree, and delays by DHA in meeting other requirements of the Decree. However, all of these other alleged violations by DHA have been settled—so that this opinion has addressed all of the pending matters concerning DHA's violations of the Consent Decree.

### III. Appointment of Special Master

As detailed in the previous section, DHA repeatedly violated the Consent Decree—beginning almost with its inception and continuing at least through December 12 and 14, 1988, when the last hearing was held in this matter. These violations by DHA were pervasive; and, many were particularly egregious, including these:

> ... requiring the Housing Mobility Division to spend substantial time on other work, and then dismantling it in October of 1988;

> ... refusing to put the 120% Fair Market Rent Exception for § 8 vouchers in use, thus forcing voucher holders to stay in minority areas;

> ... deliberately reducing the number of § 8 certificates and vouchers in use during the first Decree year;

> ... not requesting any code enforcement for Housing Quality Standard violations for a 7–8 month period (August 1987—April 1988); and

> ... not meeting a single deadline for the 100 units of new low-income public housing.

---

**50.** However, because of the horrible conditions in West Dallas (see *Walker III*), only 2.1%—21 persons out of 1000 applicants—actually chose to move into West Dallas.

**51.** In addition, there were obvious mistakes made by DHA with the § 8 waiting list; for

example, on March 25, 1988, DHA conceded that the person on the top of the § 8 waiting list should not have been there—because she was not a tenant in another DHA project. See Decree Plan, Summary 3.

The Consent Decree affects every aspect of DHA's operations. Moreover, it is obvious that complex questions will continue to confront the Court concerning the performance of all parties under the Decree—including the City of Dallas, which is being joined as a party defendant subject to the Consent Decree (see *Walker III*)—and that, without the help of a Special Master, decisions by this Court on critical issues will be unnecessarily delayed.[52]

Under these extraordinary circumstances, it is clear that a Special Master should be appointed, under Rule 53, Fed.R.Civ.P. *Gary W. v. Louisiana*, 601 F.2d 240, 244 (5th Cir.1979); *Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir.1982), *modified on other grounds*, 688 F.2d 266, *cert. denied* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). See also these complex public housing discrimination cases in which a Special Master has been appointed: *Chicago Housing Authority v. Austin*, 511 F.2d 82, 86–87 (7th Cir.1975); *Young v. Pierce*, 640 F.Supp. 1476 (E.D.Tex.1986), *vacated and remanded for consideration of terms following partial settlement*, 822 F.2d 1368, 1374–1376 (5th Cir.1987), and 685 F.Supp. 975 (E.D.Tex.1988) (East Texas housing desegregation case).

## IV. Conclusion

DHA has, as the plaintiffs claim, violated the Consent Decree's provisions concerning the tenant assignment and selection plan, the tenant mobility services, the 120% fair market rent exception for use of § 8 certificates and vouchers, the first year goal for the use of § 8 assistance in non-impacted areas, the obligation to request code enforcement for HSQ violations, and the deadlines set for the 100 units of new low-income public housing at *Country Creek.*

Because of these repeated and pervasive violations of the Decree, a Special Master will be appointed. However, the Special Master is not being appointed to supervise DHA or to interfere with DHA's new Executive Director, Alphonso Jackson. Instead, the Master is to monitor compliance by all parties—including the City of Dallas—with

the Consent Decree and to assist this Court in the difficult decisions which will be presented under the Decree.

The parties, of course, will be given time to present their positions to the Court with respect to (i) the person to be named as Special Master, and (ii) the terms of the Order under which the Master will operate. However, because of DHA's violations of the Consent Decree, as detailed in this opinion, the expense of the Special Master are to be paid by DHA until further order of the Court.

### APPENDIX A

### WALKER I

In The United States District Court For The Northern District of Texas Dallas Division

Debra Walker, *et al.*, Plaintiffs,

v.

The U.S. Department of Housing and Urban Development, *et al.*, Defendants.

Civ. A. No. CA–3–85–1210–R

CONSENT DECREE

Jan. 20, 1987

Debra Walker, *et al.*, plaintiffs, the United States Department of Housing and Urban Development ("HUD"), and the Housing Authority of the City of Dallas ("DHA"), defendants, enter into this Consent Decree (hereinafter referred to as the "Decree") for the purpose of resolving the issues raised by this lawsuit.

Plaintiffs enter into this Decree because they believe that the evidence produced to date shows an unbroken pattern of purposeful racial segregation and discrimination by DHA dating from the inception of DHA's program to the present day and that the entry and implementation of this Decree will disestablish the effects of this unlawful segregation and discrimination to the extent possible.

---

**52.** For example, the demolition of units at West Dallas under the Decree and this Court's approv-

al of the demolition plans. See the *Walker II* opinion.

DHA enters into this Decree because it believes that there is considerable evidence that the racially identifiable character of the housing offered under its programs could have been caused at least in part by official DHA action and that the entry and implementation of this Decree will remedy any alleged violation that may have been caused by this official action. DHA is entering into this Decree based solely on claims and evidence presented relating to these specific plaintiffs and the class they represent, as set forth below, and nothing contained herein shall constitute any admission of liability or basis of a claim against DHA by any other party, person or class.

HUD denies any liability with respect to any matter alleged in the First and Second Amended Complaints.

The parties have entered into this Decree in order to avoid the expense and inconvenience of further litigation in this matter. They also desire, through affirmative marketing and other action outlined herein, to undertake steps to promote equal housing opportunity in federally-assisted housing in the Dallas metropolitan area (defined herein as Dallas County and the City of Plano), whether administered by DHA or privately. Accordingly, the parties have agreed to resolve this matter on the terms set forth below and have agreed to entry and implementation of this Decree.

The parties enter into this Decree on the explicit premise that the resources currently available to DHA to implement the Decree are inadequate. In order to implement the Decree, substantial resources will have to be made available from institutions and organizations other than DHA. The parties agree that should these resources not be forthcoming after a reasonable period of time and after reasonable efforts to obtain them, the parties may by mutual agreement present to the Court modifications to this Decree as may be appropriate to accomplish the remedial purposes of the Decree. To the extent the parties are unable to agree as to the action appropriate due to resources not being made available, either DHA or plaintiffs may seek a modification of the Decree which the moving party deems necessary or appropriate to address this lack of resources.

All proposed modifications to this Decree, including modifications of exhibits hereto and including but not limited to those sought pursuant to the immediately preceding paragraph and/or paragraph 4 of this Decree, shall also be submitted to the Civil Rights Division of the United States Department of Justice at the time of submission to the Court. Any hearing on modifications shall take place not less than thirty (30) days after submission of the proposed modification to the Court and the Civil Rights Division. Under no circumstances, however, shall any modification increase, alter, or otherwise affect the financial or other obligations of HUD pursuant to this Decree without the written consent of HUD.

Therefore, based on the agreement of the parties, the evidence taken at the hearing on the fairness of this Decree to the members of the proposed class and other residents in federally-subsidized housing in the Dallas metropolitan area, and all materials submitted to the Court on the appropriateness of the relief set out in this Decree, it is ORDERED, ADJUDGED and DECREED that:

1. With respect to existing and future DHA-owned and administered housing, including housing to be made available pursuant to this Decree, DHA agrees that it will not:

 A. Assign any person to any dwelling because of race or color;

 B. Move any person ahead of any other person on any waiting or assignment list for any dwelling because of race or color or otherwise make a dwelling unavailable or deny a dwelling to any person, including persons on any waiting or assignment list, because of race or color;

 C. Provide inferior facilities, maintenance or other service to persons in any dwelling or cluster of dwellings (including a "project") because of race or color or otherwise discriminate in the provision of services or facilities in connection with the rental of such dwellings or in the

terms, conditions or privileges of rental of such dwellings;

D. Represent to any person because of race or color that any dwelling is not available for inspection or rental when it is in fact so available;

E. Fail to afford any person the same right to make and enforce a contract regarding the provision of a dwelling that is afforded to white citizens; and

F. Fail to afford any citizen the same right to lease and own property as is afforded to white citizens.

Nothing in paragraphs 1A and 1B, *supra,* shall be interpreted to affect the obligations in paragraph I.1.B of the Plan attached hereto as Exhibit B, which afford relief to victims of discrimination.

2. The following class is certified for the claims asserted in this suit:

All black persons who are presently or who during the pendency of this Decree become either (a) residents of a DHA owned or managed project, or (b) participants in the DHA Section 8 Existing Housing Program ("§ 8 EHP"). As used in this Decree, "§ 8 EHP" shall include vouchers issued under the Section 8 Program; and "participant" shall mean a holder of a § 8 EHP certificate of eligibility or voucher, or a person housed pursuant to the § 8 EHP.

3. During an interim period of thirty (30) days from the date of entry of this Decree, DHA, its agents, employees and officials, shall continue to honor § 8 EHP certificates issued by DHA in accord with the provisions of the Agreed Preliminary Injunction entered by the Court against DHA on August 19, 1986. Upon expiration of the thirty (30) days and after giving the notices as provided below, DHA will honor certificates and vouchers on any qualified unit located in the Dallas metropolitan area.

A. Within ten (10) days of the date of entry of this Decree, DHA will send a notice to all incorporated municipalities located in whole or in part in the Dallas metropolitan area that a necessary element of achieving the objectives of the § 8 EHP and this Decree is the administration of that program in a manner that gives participants the broadest possible choice of housing. It will further advise that thirty (30) days from the date of entry of this Decree, in accordance with the terms thereof, DHA will honor certificates or vouchers covering any housing in a municipality located in whole or in part in the Dallas metropolitan area.

B. Except as specifically set out, this Decree does not otherwise affect DHA's obligation, responsibility and authority to enforce the statutory and regulatory requirements of the § 8 EHP for eligibility of applicants, participants and housing units and the other administrative requirements of the § 8 EHP.

C. In administering its § 8 EHP under the terms of this Decree, DHA will provide preference to applicants who are either residents of the City of Dallas or employed therein.

D. To the extent that any part of any of DHA's policy and procedure manuals, handbooks or other controlling documents are incompatible with the terms of this Decree, such policies and procedures will be modified within ninety (90) days of the date of entry of this Decree to be consistent with and further the objectives of this Decree.

E. DHA will notify all present § 8 EHP applicants, participants, landlords, and rental housing unit owners and managers who have inquired or inquire about the availability of DHA's § 8 EHP for housing units located in the suburbs that DHA is honoring Section 8 certificates and vouchers for housing located in the metropolitan area and suburbs, as set out in this Decree. Such notice shall be issued within thirty (30) days of the date of entry of this Decree and shall be in the form and content set forth in Exhibit A, attached hereto.

F. Henceforth, DHA will include in the materials given to its § 8 EHP applicants and participants a notice that the operation of the program includes housing located in the Dallas metropolitan area. This notice shall be an item included in each participant's package provided on orientation and

shall be in the form and content as set forth in Exhibit A, attached hereto, and shall be in addition to all the information required to be furnished by Chapter 7 of HUD handbook 7420.7, including notice of the location of all HUD assisted or insured rental projects located in non-impacted areas, which information shall also be furnished to each participant.

4. Attached as Exhibit B is a plan which is directed towards achieving the remedial purposes of this Decree. This plan (referred to hereafter as the "Plan") is incorporated into and is a part of this Decree and shall be effective on the date of entry of this Decree and shall be implemented in accord with the timetable established therein. DHA's failure to comply with any provision of the Plan shall be a basis to refer this matter to the Court or to seek modifications to the Decree as may be necessary or appropriate to further the purposes of the Decree and Plan.

5. Included in the Plan is a program for the West Dallas project, TX9–11 ("West Dallas" or the "Project"). With respect to the Project, the parties agree that:

A. The housing as it exists today in West Dallas constitutes a severe concentration of deteriorated housing. It is one of the largest single groupings of low rise, family public housing units which was built under the program and has been the source of serious management problems for DHA since they were brought into the program.

B. In addition, there has been a lead contamination occurrence which, despite corrective action, continues to impose a blighting influence on the residential use of the area. This has contributed to the overall deterioration and there are now approximately 1300 virtually uninhabitable units spread throughout the Project.

C. Residents of the West Dallas project have been subjected to adverse social conditions in addition to the physical problems detailed above.

D. There is virtually no possibility of achieving an acceptable physical and social living environment without a massive commitment of resources.

E. While a massive commitment of resources could result in short-term improvement of all the Project's dwellings, the locational, density and environmental factors noted above negate any prospects for their long-term viability, except for the sections of the Project for which HUD has allocated funds for modernization.

F. Although funds have been allocated for modernization of certain sections of the project, HUD is withholding authorization to proceed with modernization contracts pending development of a plan for treatment of the remaining areas of the Project.

G. HUD has determined that allowing the remaining areas, or any part of them, to continue as is, or to be redeveloped as low income housing, would tend to decrease the long term viability of the sections of the project for which modernization funds have been allocated. DHA agrees with this conclusion.

6. DHA shall develop a comprehensive plan regarding the Project which shall be submitted to and reviewed by HUD to determine, *inter alia*, whether the plan is consistent with the United States Housing Act of 1937, 42 U.S.C. § 1437 *et seq.*, and implementing regulations. The plan shall include the following elements:

A. Comprehensive modernization of the approximately 800–900 units located in the modernization areas detailed in the attached Plan.

B. DHA shall submit to HUD an application for approval to relocate all residents of the clearance areas of the Project without regard to race and demolish the units located in the clearance areas, as detailed in the Plan. The application for demolition shall include a request for provision by HUD of one-for-one replacement of both the currently occupied and vacant units in the West Dallas project that are to be demolished under the comprehensive plan, with housing units to be provided pursuant to HUD's public housing and/or § 8 EHP program.

C. DHA shall demolish a unit in the Project for every such unit provided by HUD pursuant to this Decree and comprehensive plan. Actual demolition of any unit shall not start, however, until plaintiffs and DHA agree that a one-for-one replacement of such unit can be reasonably expected to be received from future allocations of funds.

D. Agreement pursuant to ¶ 6C shall not be withheld unreasonably by plaintiffs or DHA. HUD may move the Court to determine whether plaintiffs and/or DHA are withholding their agreement unreasonably. Upon such agreement between DHA and plaintiffs pursuant to ¶ 6C, or upon the Court's determination that plaintiffs and/or DHA have withheld their agreement unreasonably, DHA shall demolish the unit(s) in question as soon as practicable. HUD may move the Court to determine whether DHA has failed to demolish any unit(s) as soon as practicable and to seek an order requiring immediate demolition of the unit(s) in question.

E. For the purposes of this Decree, the term "unit" shall not include a former dwelling unit converted to any other use, *e.g.*, office space, storage space, maintenance facilities, day care and schools.

7. HUD agrees to make a commitment to DHA of 1000 1986 fiscal year units, subject to the conditions described below. The 1000 units shall consist of: 1) 100 units of new construction low rent public housing pursuant to HUD Notice PIH 86–7; *see also* 42 U.S.C. §§ 1437d(j) & (h); 2) 450 units of Section 8 certificates; and 3) 450 units of Section 8 vouchers.

A. These 1000 units are to be utilized for the sole purpose of carrying out the proposals included in the Plan for the clearance areas of the Project. DHA, however, may relocate such West Dallas families by means of other available units at its disposal. For each such West Dallas family relocated by such other means, DHA may transfer one of these 450 Section 8 certificates or 450 vouchers to its § 8 EHP.

B. DHA shall not utilize any of these 1000 units until HUD has reviewed and approved the comprehensive plan for the Project referred to in ¶ 6, *supra*.

C. In addition to the requirements of ¶ 6, *supra*, the comprehensive plan shall provide for the demolition of 1000 units in the Project as soon after its approval by HUD as is practicable and DHA shall comply with that provision of the comprehensive plan. Demolition of these 1000 units shall not result in the reduction of the tenant population of the Project, unless a family voluntarily expresses a desire to relocate.

D. Because HUD's commitment of these 1000 units will be made administratively before the fairness hearing and entry of this Decree, should this Decree not be entered for any reason, DHA hereby agrees to submit to HUD an approvable plan for the demolition of 1000 units in the Project within sixty (60) days after the Court has determined not to enter this Decree. Upon HUD's approval of that plan, DHA shall demolish those units as soon as practicable. DHA further agrees not to utilize these 1000 fiscal year 1986 units until HUD has approved the plan required under this sub-paragraph. Demolition of these 1000 units shall not result in the reduction of the tenant population of the Project unless a family voluntarily expresses a desire to relocate.

E. Plaintiffs hereby agree that if this Decree is not entered for any reason, they will not oppose the demolition of the 1000 units in West Dallas proposed by DHA in ¶ 7D of this plan as long as the 1000 fiscal year 1986 units are available to be utilized by DHA at the time of demolition.

F. In the event this Decree is not entered by the Court, ¶¶ 7D & 7E of the Decree shall constitute a separate and binding agreement upon the parties to the Decree.

8. During the implementation of the Decree and Plan, any proposal to sell or otherwise remove from the housing inventory of DHA any housing units, other than as provided in this Decree or as may occur in the normal operations of DHA programs in order to provide office or support staff, will be submitted to the Court for approval to

insure that such action will not interfere with implementation of the Decree and Plan. This requirement will cease at such time as DHA is determined, as provided below, to have complied with this Decree. This requirement shall not apply to proposals to modernize, upgrade or redevelop project sites in a manner that does not result in a reduction in the number of units available at the project site.

9. If there is a final judicial determination in this case that Texas law will not otherwise allow the use of DHA's Section 8 certificates or vouchers outside the city limits of the City of Dallas, DHA will seek to develop means to allow DHA's § 8 EHP participants to use their certificates or vouchers in the Dallas metropolitan area pursuant to §§ 882.103(c) and 882.121, including requests for HUD assistance.

10. During the period of the Court's jurisdiction over HUD, HUD will provide technical assistance:

A. to promote DHA's efforts to market HUD-assisted housing projects in all parts of the Dallas metropolitan area to black Section 8 applicants and certificate holders, including areas and complexes where their race does not predominate.

B. in connection with DHA's efforts to market § 8 EHP to landlords in all parts of the Dallas metropolitan area, with special emphasis on areas where few or no landlords currently participate.

C. to better ensure that DHA Section 8 certificates are used only for housing units that meet HUD's housing quality standards set forth in 24 C.F.R. § 882.109. This technical assistance will be in addition to any activity HUD performs in the normal course of its business, and will specifically target problems of the DHA Section 8 program.

D. to the DHA Housing Mobility Unit staff regarding its fair housing function, and will provide a liaison person within the HUD Regional Office to deal directly with Title VI and Title VIII complaint referrals from the DHA unit (this should not be read to imply that such staff or such liaison needs to be assigned these duties as their full time responsibility).

E. to DHA to promote DHA's successful implementation of the Decree. The assistance may be requested by DHA or initiated by HUD.

11. During the period of the Court's jurisdiction over HUD, HUD will furnish plaintiffs on a semi-annual basis a status report on the technical assistance furnished pursuant to ¶ 10 of this Decree. Such reports will include the following:

A. the date(s) of the technical assistance.

B. the nature of the technical assistance (*i.e.*, the item(s) in the Decree to which the assistance relates and a brief description of the assistance).

C. the names of the persons providing the technical assistance.

D. the results of any follow up efforts or other information which DHA may have provided to HUD in response to the technical assistance.

E. copies of all documents between DHA and HUD regarding the technical assistance.

12. During the period of the Court's jurisdiction over HUD, HUD will furnish the Court quarterly reports for the first year of operation under the Decree and then semi-annual reports thereafter. These reports will be limited to the subject matters contained in ¶ 11 above and will also contain the portions of the reports set out in ¶¶ 11A, B, and D, *supra.*

13. In order to assure that the Court and the parties have the information necessary to monitor compliance with and progress under this Decree and Plan, DHA will file quarterly status reports to the Court the first year and semi-annual reports thereafter. Plaintiffs will also report to the Court on a quarterly basis.

14. In addition to the reports filed with the Court, DHA will prepare and maintain reports containing the following information on a monthly basis, which they will make available to plaintiffs' attorneys on request:

A. Title VI Record of Application data.

B. Record of offers, acceptances and placements under the LRPH relocation program.

C. Geographical distribution of Section 8 and voucher units.

D. Names of landlords willing to participate in the § 8 EHP and the location of units available for the program in non-impacted areas.

E. Results of the Section 8 and voucher Housing Quality Standards ("HQS") inspections and quality control process.

F. The racial occupancy characteristics of DHA's projects, programs, and waiting lists.

15. The DHA will make available to plaintiffs' attorneys upon request the following documents:

A. Applications for resources to implement the Decree and the Plan.

B. Section 8 and voucher HQS complaints, inspection reports, and all documents reflecting the resolution of HQS complaints.

C. All documents reflecting fair housing complaints and DHA action on such complaints.

16. The undertaking and accomplishment of this Decree, including the Plan, shall constitute full and complete settlement of the case as to the class identified herein, with the exception of attorneys fees, expenses and costs. No additional relief or modification may be sought except as provided herein. In consideration of the relief provided by HUD pursuant to this Decree, all claims against HUD, except any claim for attorneys fees, expenses and costs, shall be dismissed with prejudice and no further relief shall be sought against HUD by any party under any circumstance in connection with this lawsuit, except as herein provided. HUD reserves the right to oppose any application for attorneys fees, expenses, or costs.

17. The Court will retain jurisdiction over defendant DHA for a period of five (5) years from the date of this Decree, and over defendant HUD for a period of three (3) years from the date of this Decree, to supervise the implementation of the Plan, consider any modifications that may be necessary as provided herein, and otherwise monitor DHA and HUD's efforts to comply with this Decree. It is the intent of the parties to this Decree that implementation of the Plan will be successfully accomplished within this five year period.

18. Fifty-seven (57) months from the date of entry of this Decree, plaintiffs will file with the Court a status report setting out their position as to whether DHA has complied with this Decree. Thirty (30) days after service of the plaintiffs' status report, DHA will file a response to the report with the Court. Plaintiffs may file a reply to DHA's response no later than twenty (20) days after service of DHA's response. If the two parties are in disagreement concerning DHA's compliance, they shall notify the Court. No sooner than thirty (30) days after such notification to the Court, the Court will hold a hearing at which time plaintiffs will be required to show cause why DHA has not complied with this Consent Decree. This status report and notification shall be submitted to the Civil Rights Division of the United States Department of Justice at the same time it is submitted to the Court.

19. Thirty-three (33) months from the date of entry of this Decree, plaintiffs will file with the Court a status report setting out their position as to whether HUD has complied with this Decree. Thirty (30) days after service of the plaintiffs' status report, HUD will file a response to the report with the Court. Plaintiffs may file a reply to HUD's response no later than twenty (20) days after service of HUD's response. If the two parties are in disagreement concerning HUD's compliance, they shall notify the Court. No sooner than thirty (30) days after such notification to the Court, the Court will hold a hearing at which time plaintiffs will be required to show cause why HUD has not complied with this Decree. Should plaintiffs have reason to believe that HUD is not complying with this Decree at any time during the three year period, plaintiffs shall notify the

Regional Counsel for HUD Region VI and HUD's Associate General Counsel for Litigation in Washington, D.C., in writing, of plaintiffs' belief and its basis.

20. The Court's continuing jurisdiction over DHA shall end five years from the date of entry of the Decree, and its jurisdiction over HUD shall end three years from the date of entry of the Decree, unless the Court finds after a hearing held pursuant to ¶¶ 18 or 19, *supra*, that DHA or HUD has not complied with this Decree, in which case the Court shall retain jurisdiction over the party found to be in non-compliance for the purpose of effectuating compliance. The Court shall retain jurisdiction over the party found to be in non-compliance until the Court has determined that the party has cured its non-compliance.

21. The Court further retains jurisdiction to consider any claims for attorneys fees, litigation expenses, costs and the individual damage claims of the plaintiffs against DHA. Nothing contained herein shall constitute an admission of injury to any individual plaintiff by any defendant, or by any of its officers, employees or agents. To recover damages against the DHA, each individual plaintiff shall be required to show the legal right violated and the injury suffered by that plaintiff.

22. DHA and HUD agree that neither the Decree nor the Plan shall be used by DHA as a defense to any compliance review or investigation or enforcement action brought by the United States under Title VI of the Civil Rights Act of 1964 or Title VIII of the Civil Rights Act of 1968.

/s/ Jerry Buchmeyer
United States District Judge

Agreed to in form and substance:
Julian & Daniel, P.C.
3301 Elm St.
Dallas, Texas 75226
214–939–9230
By: /s/ Michael M. Daniel
Elizabeth K. Julian
Michael M. Daniel
DATE: 1–16–87

North Central Texas Legal Services Foundation, Inc.
3108 Live Oak
Dallas, Texas 75204
By: /s/ Kenneth Schorr
Kenneth Schorr
DATE: 1/16/87
Attorneys for Plaintiffs
/s/ Rogers Teel
Rogers Teel
2525 Lucas Drive
Dallas, Texas 75219
DATE: 1/16/87
Attorney for DHA
/s/ Thomas H. Peebles
Thomas H. Peebles
Department of Justice
Civil Division, Room 3732
10th & Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 633–4778
DATE: Jan. 15, 1987
/s/ Jonathan Strong
Jonathan Strong
Office of General Counsel
United States Department
of Housing and Urban
Development
451 Seventh Street, S.W.
Washington, D.C. 20410
(202) 755–4942
DATE: January 15, 1987
Attorneys for HUD

## EXHIBIT A

TO: Certificate and Voucher Holders, Section 8 Applicants, Participants & Landlords

FROM: Housing Authority of the City of Dallas (DHA)

SUBJECT: Section 8 Existing Housing Assistance Program Leasing Units in Suburbs Outside the City of Dallas

Under a Consent Decree entered in the case *Walker, et al. v. HUD, et al.*, DHA has agreed to enter into contracts covering units located in the general metropolitan area of the City of Dallas on the same

basis as it does units located in the City of Dallas.

The area in which you may seek to find a unit is as follows:

All cities located in whole or in part in Dallas County and the City of Plano.

This should give participants a larger choice of housing and DHA will work with you on any unit located in the above area. If you are interested in obtaining a unit in any particular area, contact your case worker and he/she will assist you in determining if there are units available. If you are a landlord with available units, contact the Section 8 office to include your units on an information listing.

## EXHIBIT B

## PLAN FOR THE HOUSING AUTHORITY OF THE CITY OF DALLAS, TEXAS

### Preface

The Dallas Housing Authority ("DHA") intends to undertake this Plan, in accordance with civil rights and fair housing laws, to remedy the unlawful discrimination alleged by plaintiffs in this lawsuit. This goal applies to all DHA public housing projects and Section 8 developments and programs.

### Summary of Plan Objectives

In order to implement this remedial process, DHA will begin a program containing five elements:

1. Establishment of procedures for administering DHA's expanded Section 8 existing and voucher programs in Dallas and the suburban areas of Dallas in a manner that will assure that housing standards are in compliance with program requirements and codes of the local governing body.

2. Establishment of a new Housing Mobility Division within DHA's organizational structure. DHA understands that it will not receive funding from HUD to operate this Division and no party to the Decree shall seek such funds from HUD. This Division will promote and make housing mobility possible for black and other minority families of DHA's housing programs by:

A. Conducting outreach to owners of private rental housing in areas where few Section 8 certificate or voucher holders currently reside, with particular emphasis in non-racially-impacted areas of Dallas and the suburbs.

B. As part of the entire process of preparing for, locating and contracting for housing in those areas, assisting and counseling with families who are seeking such housing.

C. Making non-minority families aware of housing opportunities available through programs and projects of the DHA, with particular emphasis upon the low rent public housing program.

D. Administering tenant relocation programs of the DHA pursuant to this Decree.

E. Working directly with organizations involved in Fair Housing issues in Dallas to assure that all cases of alleged discrimination encountered by DHA staff or program participants are investigated and reported to appropriate authorities.

F. Complying with the Housing Mobility requirements of HUD Handbook 7420.7 (11–79), Chapter 7.

3. Providing special housing opportunities, as set forth in Part I, *infra,* for all families in good standing under the terms of their lease who are living in DHA's family projects as of the date of the Plan and Decree.

4. Achieving a decent, safe, and sanitary environment for the residents of the West Dallas project by the following actions:

A. Modernizing approximately 800–900 units for which funding has already been made available by HUD.

B. With respect to the remaining approximately 2,600 dwelling units,

1) demolishing those that are currently vacant;

2) relocating the current occupants outside the West Dallas project or to units modernized pursuant to ¶ 4A of this Plan, *supra;*

3) as units are vacated by occupant families, demolishing those structures; and .

4) preparing the land for redevelopment for uses other than assisted low-income housing. See attached map—Exhibit 1, indicating the West Dallas Modernization and Clearance Areas.

5. Establishing a program designed to improve the administration of DHA's projects and programs.

I. Housing Assistance for Families Living in DHA's Developments

1. The following special housing opportunities will be made available to all families in good standing (as defined in II.2.F, *infra*), under the terms of their lease, who are living in DHA's family projects as of the date of this Decree and Plan (except for those living in any clearance area of the West Dallas project who will be provided different special opportunities, as described under paragraph I.2, *infra*):

A. Elderly ("elderly" as used in this Plan includes elderly, handicapped, and disabled) residents in a family project will be offered the following opportunities, from which they may choose, at their option:

(1) A Section 8 existing certificate or voucher;

(2) An opportunity to move into a vacant unit in any of DHA's projects designed for elderly.

B. Elderly black residents in a predominantly black elderly project (Park Manor, Simpson Place, Oakland Terrace) who were housed pursuant to an offer made between January 1980 and the date of entry of the Decree, and who wrongfully did not receive an offer in one of the predominantly white projects (Lakeland Manor, Audelia Manor, Forest Green, Brooks Manor, and Cliff Manor) according to the DHA Record of Application, will be identified by counsel for the parties. Any disagreement among the parties regarding the identification of the wrongfully housed residents shall be referred to the Court, which may refer the matter to a magistrate. Those persons so identified will be notified of the opportunity to be offered the next available unit in the predominantly white elderly projects listed above. Any person so notified who does not want to consider such an offer will be

removed from the list for this special one-time offer. All persons who indicate that they wish to consider such an offer as the vacancy comes available will be offered the next available vacancy in these projects. Priority among those wishing to relocate shall be given to those living in public housing the longest. The offers will be made by application date. To the extent that there is more than one vacancy available at the time of the offer, the person may choose the vacancy of his or her choice.

C. Non-elderly residents will be offered a Section 8 existing certificate or voucher.

D. Those living in the areas of the West Dallas project to be modernized who reject the above offer shall be relocated, temporarily or otherwise, and have their moving expenses covered in accordance with the relocation plan already approved by HUD in connection with the modernization of those areas.

2. The following special housing opportunities and financial assistance will be made available to all families in good standing under the terms of their lease living in the clearance areas of the West Dallas project as of the date of this Decree and Plan:

A. Housing Opportunities to be offered, from which families may choose, at their option:

(1) Priority consideration will be given for relocation into vacant dwelling units of the size needed by the family in any of DHA's projects; or

(2) A Section 8 existing certificate or voucher will be made available that can be used by the family in relocating to any area served by DHA.

B. Financial Assistance:

(1) All families who permanently relocate will receive:

(a) Moving expenses, and

(b) A dislocation adjustment payment of $200.

(2) All families who move permanently into either a Section 8 existing unit or a

non-assisted unit will receive an additional transition payment as follows:

(a) $500 if relocated to a 1–bedroom unit;

(b) $600 if relocated to a 2–bedroom unit;

(c) $700 if relocated to a 3–bedroom unit;

(d) $800 if relocated to a 4–bedroom unit;

(e) $1,000 if relocated to a 5– or larger bedroom unit;

(3) Families that must be moved temporarily to another West Dallas dwelling unit will receive moving expenses only.

3. Under no circumstances shall HUD be responsible for any expense, cost, or payment incurred under section I.

II. Plan Implementation Procedures and Policies That Apply to Residents Currently Living in DHA's Developments

1. In DHA's family projects except for the clearance areas of West Dallas:

A. DHA will hold meetings with affected residents explaining the housing opportunities available to them.

B. DHA will send a letter to all affected families advising them of the housing opportunities available and requesting an indication of their interest in relocating. Such letter will include a copy of the notice that constitutes Exhibit A to the Decree.

C. Families will have 60 days from the date DHA's letter is sent to make a decision and advise DHA of their interest in taking advantage of the opportunity available.

D. DHA will provide advice and counseling with respect to the Plan to residents throughout the process.

E. Those choosing to accept the § 8 EHP opportunities offered them shall be placed at the top of DHA's § 8 EHP waiting list. Among those making that choice, in issuing Section 8 certificates or vouchers for their relocation, first priority will be given to those residents relocating from the non-clearance areas of the West Dallas project. Priority among those relocating from sites other than the West Dallas project shall be given to those who have been living in public housing the longest.

2. In the West Dallas project:

A. DHA, through a series of meetings, notices and counseling, will make residents aware of the effect of the Decree and Plan on West Dallas and of the various forms of assistance available to them.

B. New housing assignments will be made in the West Dallas modernization areas as shown on the attached map (Exhibit 1) in accordance with an overall schedule that will give priority consideration to filling units with West Dallas families living in the clearance areas who wish to relocate permanently to the modernized areas, except insofar as those families in the modernized areas wish to return to those areas after modernization. In that event, those wishing to return shall have priority.

C. While DHA will make a good faith effort to minimize the hardships created by multiple moves, it is understood that it may be necessary for some families to be moved temporarily from one location of West Dallas to another area of the project to permit the clustering of vacant buildings for clearance.

D. Clearance and demolition of buildings will follow a carefully-developed plan to be submitted and approved by HUD. While individual vacant buildings in scattered locations may be cleared, DHA will attempt to vacate all of the buildings in one section of the project for total clearance before proceeding with similar activities in another section of the project.

E. The special opportunities for alternate housing choices and relocation assistance will be available to families in the clearance areas of West Dallas until modernization is complete in the non-clearance areas of the project and units are available in those areas of the sizes needed by the remaining families who have not otherwise chosen to relocate permanently. At that point, the remaining families in the clearance areas will be permanently relocated to a modernized unit in one of the non-clearance areas of West Dallas so that the remaining clearance area buildings can be demolished.

F. The special opportunities for alternate housing choices and relocation assist-

ance will not be available to residents who vacate their unit as a result of legal action for non-payment of rent or other lease violation and/or do not give proper notice of intent to vacate in conformity with the provisions of their lease.

III. General Procedures to Improve DHA's Administration of DHA's Projects and Programs

1. To assure that Housing Quality Standards ("HQS") are enforced in all Section 8 existing and voucher units and in the new units secured by the Housing Mobility Division, DHA will:

A. Either contract with respective cities to have initial and annual inspections carried out by the city housing code staff, or DHA will utilize its own staff or contract with staff of other Section 8 programs to carry out the inspections. Where units are found to be in violation of HQS or city codes, steps to obtain compliance will be taken in accordance with Chapter 5 of HUD Handbook 7420.7 and DHA will request code enforcement from the city within which the unit is located.

B. Carry out quality review inspections of at least 30% of all Section 8 units within 90 days of the initial or annual inspection for the first year of this Decree, 20% for the second year and 10% for the third year.

C. Carry out perimeter inspections of all Section 8 units and complexes at least twice annually, noting all obvious code violations on surrounding properties and reporting these to appropriate city officials for follow-up code enforcement.

D. Respond to all tenants reporting complaints to DHA staff about their units or projects by notifying managers of the complaint and asking them to address the complaint. Where the complaint is not addressed appropriately in a reasonable time period, staff will take the steps outlined for such situations in Chapter 5 of HUD Handbook 7420.7. A "reasonable time" will be determined by the severity of the condition of which the tenant is complaining.

E. A special opportunity will be provided to families currently participating in the Section 8 existing program as of the date of entry of the Decree to assure that the dwelling unit they occupy meets Section 8 Program HQS and local code standards. Within thirty (30) days from the entry of this Decree, all Section 8 families shall be notified by letter that if they believe that the dwelling unit they occupy does not meet § 8 HQS and/or local code standards, they may:

(1) Seek from their landlord the correction of any dwelling unit conditions they believe violate HQS and/or code standards; and

(2) If the landlord fails to correct the reported building deficiencies within a reasonable period of time, they may request the DHA to inspect the property and to take those actions as may be appropriate to have corrected any violations that may exist.

(3) If prior to notice, the family has already requested the landlord to correct the deficiencies, the family may request the DHA inspection without further communicating with the landlord.

F. Upon receipt of notice by a participating Section 8 family that they have notified the landlord of building deficiencies, have given the landlord a reasonable period of time to correct the deficiencies, and have been unsuccessful in obtaining needed corrections, DHA will conduct the requested inspections within a reasonable period after receipt of the request, but not to exceed ten (10) days. The inspection will be conducted by a DHA employee qualified to conduct inspections pursuant to HUD HQS in accordance with the procedures used for initial HQS inspections. If the unit fails to pass the inspection, the matter will be dealt with as outlined in Chapter 5 of HUD handbook 7420.7. The requests for inspection, the inspection reports and all documents reflecting the resolution of the complaint will be made available to attorneys for plaintiffs upon request.

2. To assure that Section 8 program participants are aware that they can move to another dwelling upon completion of one year's tenancy under their lease, DHA will send notice of this fact to all current partic-

ipants under the program. Future Section 8 participants will be advised of this availability to change from one dwelling unit to another during DHA's briefing session with new program participants.

3. All current and future participants in the Section 8 existing and voucher program will be notified of DHA's Housing Mobility Unit and the availability of counselling and referral services to assist any certificate or voucher holder who wishes to locate alternative housing in areas where his or her race does not predominate. The content of the notice to be provided will be agreed upon by the parties. Counseling shall include notice of units available in non-impacted areas (including all HUD–assisted or insured rental projects in such areas), a description of the location or neighborhood in which suitable units may be found, and the facilities and services available in those neighborhoods, such as schools, day care, health care, and public transportation.

4. The DHA will conduct a public information and outreach program to landlords with units in the Dallas metropolitan area, including areas where few or no landlords currently participate, to make them aware of the rental opportunities available under programs administered by the DHA.

5. A new Housing Mobility Division will be established for the purposes previously described. The division will be headed by a staff person at the Assistant Director level, with a minimum of five other staff persons (one real estate outreach person, three counselors and one clerical person). Effort will be made to place the division in a location that is more accessible to the public than the present DHA Resident Selection and Section 8 buildings. Once residents are placed by the Housing Mobility Staff, they will be treated in the same manner as all regular Section 8 certificate holders with regard to handling of all interim examinations and re-examinations and other services under the Section 8 program. Either through the activities of this unit or through other means DHA will comply with the Housing Mobility requirements of HUD Handbook 7420.7 (11/79), Chapter 7.

6. The DHA will conduct a public information and outreach program to make low-income, non-minority people aware of the housing opportunities available under programs administered by the DHA.

7. The DHA will adopt a one offer, one refusal tenant selection and assignment plan. When an applicant comes to the top of the waiting list, and more than one available, appropriately-sized unit exists, the applicant shall be offered one such unit which shall be selected in a random, race-neutral fashion by having all such units listed on separate pieces of paper, one of which is drawn by an employee of DHA. If this unit is in a location where the applicant's race predominates (as used herein, a race predominates at a site when that race exceeds by 10% the city-wide average for that race by persons eligible to live in the project), he or she shall be offered all appropriately-sized units where his or her race does not predominate. If no such units at other-race locations are available at the time an applicant reaches the top of the waiting list and the applicant wishes to wait for such a unit to become available, he or she shall be offered his or her choice of the next appropriately-sized unit where his or her race does not predominate. If the applicant refuses this offer, he or she shall drop to the bottom of the waiting list.

8. To the extent that DHA is unable to offer a family applying for housing during the pendency of this Decree a Section 8 certificate or voucher, and such family is offered and accepts a unit in a public housing project, that family shall be advised that they may place their name on the waiting list for Section 8 certificates or vouchers. The family shall be so advised in writing and shall exercise that option at the time of their acceptance of the unit or indicate that they do not wish to do so. Unless the family exercises the option at that time, DHA shall be under no obligation to afford them the opportunity to place their name on the Section 8 or voucher waiting list at a later time. When a certificate or voucher becomes available for the family, DHA shall notify the family. The family shall thereafter have fourteen

days to accept or reject the offer of the certificate or voucher.

9. DHA will apply for all possible housing allocations or other forms of assistance that may become available through HUD that might help to accomplish the goals of this plan.

10. DHA will promptly submit a request for HUD approval of 120% FMR exception rents for those areas of metropolitan Dallas in which reasonable rents exceed the published FMRs.

11. DHA will move without delay to develop the 100 LRPH units that are part of the 1000 units committed by HUD herein.

A. These units shall be located in non-racially impacted areas pursuant to HUD's site-selection regulations.

B. DHA will select sites within six (6) months of the date of this decree, begin construction of the units within fifteen (15) months of the Decree and begin initial occupancy of the units within twenty-four (24) months of the Decree. If it appears that DHA will be unable to meet any of these deadlines, DHA will give notice of such inability to the court and state the reasons for the delay.

12. In order to be determined to have complied with this Decree, DHA will meet the following standards with regards to the housing mobility provisions of the Decree and Plan:

A. Each year under the Decree, DHA commits to use every good faith effort to locate a substantial percentage of its Section 8 certificate or voucher units outside census tracts in which there are currently 10 or more Section 8 certificates in use. In furtherance of this effort, DHA will identify as available the following percentage of Section 8 certificate or voucher units outside census tracts in which there are currently 10 or more Section 8 certificates in use:

First year—15%

Second year—30%

Third year—50% (of which 15% of the total DHA Section 8 certificate or voucher units will be in the suburbs).

B. In meeting the above standards, plaintiffs and DHA may agree to include specific census tracts which otherwise would not be included because they have more than ten (10) certificate units, if the location of the units in that census tract meets the site and neighborhood criteria set out in the regulations governing site selection for Section 8 Substantial Rehabilitation Projects, 24 C.F.R. 881.206(a), (b), (c), (f), (g), and is free from serious adverse environmental conditions.

C. If, thirty (30) days prior to the anniversary date of the Decree, DHA has reason to believe that it will not meet these identification standards, it shall notify the plaintiffs and the Court in writing, identify the reasons therefor, and propose actions which allow the standards to be met within a reasonable period of time. If plaintiffs and DHA are unable to agree as to the resolution of DHA's failure to meet the standards, they shall submit the issue to the Court for resolution.

13. Tenant Selection and Assignment Procedures

In administering the Tenant Selection and Assignment ("TS & A") plan agreed to in paragraph III.7 of the Plan, DHA will make offers based on a vacancy date that corresponds to the date the unit is actually vacated.

The TS & A plan will include a single waiting list from which applicants will be chosen to fill vacancies at any of DHA's LRPH projects, § 8 New Construction and § 8 Substantial Rehabilitation projects. The TS & A plan will include procedures for effective monitoring of DHA staff compliance with the TS & A procedures. The plan will be adopted and implemented within thirty (30) days of the date of the Decree.

14. Documentation of Offers

An offer of a unit will be documented during the period of this Decree on a separate "offer form" which will contain the following information: person to whom the offer is made, race of person, how the offer is made, who (name of DHA staff person)

made the offer, date of the offer, offer (project and unit), and, and pool of vacancies from which this offer was made. These forms will be made available to counsel for plaintiffs upon request.

15. Location of Housing Mobility Units

The locations of the housing mobility units will be adjacent to or in close proximity to whatever location DHA uses for taking applications for all its housing. Under no circumstances are the locations for Section 8 and LRPH to be physically separated so that persons wishing to apply for housing "are steered" to a particular program by the location of the application for that program.

EXHIBIT 1

APPENDIX B

WALKER I

In The United States District Court For
The Northern District Of Texas
Dallas Division

Debra Walker, et al,

Plaintiffs,

v.

U.S. Department of Housing and Urban
Development, et al,

Defendants.

Civ. A. No. CA3–85–1210–R

CLASS ACTION

FINDINGS OF FACT AND CONCLU-
SIONS OF LAW APPROVING THE
PROPOSED CONSENT DECREE

Jan. 20, 1987

On Jan. 9, 1987, the Court announced in open court its approval of the proposed settlement and explained in detail its consideration of the various objections raised by class members and other people concerned with the problems of providing an adequate supply of decent, safe and sanitary low-income housing in the Dallas area. These written findings and conclusions in support of the Court's decision are based on the evidence and argument submitted at the fairness hearing, the written submissions of the parties and others and are the Court's modifications of the proposed findings and conclusions submitted by the plaintiffs.

Plaintiffs Debra Walker, et al, brought this lawsuit to remedy the alleged purposeful discrimination by defendants Housing Authority of the City of Dallas [DHA] and the U.S. Department of Housing and Urban Development [HUD] which caused racial segregation in the DHA low income housing programs. Plaintiffs Walker, Williams, Brown, Thompson, Washington, and Lang are all eligible recipients of DHA housing program assistance. Five of the plaintiffs

are currently participating in the Section 8 Existing Housing Program and one of the plaintiffs, Janette Washington, is a resident of the Roseland Homes project, one of DHA's low rent public housing program projects. The seventh plaintiff, Mary Dews, is a tenant counselor employed by the Dallas Tenants Association whose duties primarily involve counseling and advocacy for low income tenants needing or receiving DHA or HUD housing assistance. All of the plaintiffs are black.

Plaintiffs' counsel have represented to the Court that, in addition to representing the named plaintiffs, they also have as clients several residents of the West Dallas project. Plaintiffs' counsel state that each of these clients supports the approval of the settlement. Had the case proceeded to a contested class determination hearing, plaintiffs' counsel state that they would have sought leave to amend their complaint to add these West Dallas project residents as additional class representatives.

The suit was originally brought to represent a class of all applicants for and recipients of DHA's housing assistance programs. The class which is proposed in the consent decree is the class of all black persons who are presently or who during the pendency of this decree become either (a) residents of a DHA owned or managed project, or (b) participants in the DHA Section 8 Existing Housing Program [§ 8 EHP]. This class numbers approximately 7,200 black households. [Plaintiffs' Exhibits 1, 2].

A proposed consent decree settling all matters of class relief has been presented to the Court for approval. All of the named plaintiffs and plaintiffs' counsel recommend approval of the proposal.[1]

Notice of the proposed settlement, as approved by the Court, was given to each individual class member and to each person receiving DHA assistance by either mail or hand delivery. In addition, the notice was mailed to the persons currently on the

---

**1.** In a separate order the Court has approved the requested class certification. *Baker v. Wade,* 553 F.Supp. 1121, 1125 n. 1 (N.D.Tex.1982).

 DHA waiting list, since at least some of those persons will become a recipient of DHA assistance during the pendency of this decree.

Objections to the proposed decree have been filed by a group called the Committee to Save Public Housing. The group describes itself as a support group for residents of public housing comprised of concerned citizens throughout Dallas. Its primary objection to the proposal centers around the planned demolition of many of DHA's units in its West Dallas project. The objection asserts that there is no need for the demolition in order to desegregate and that instead of demolishing units, the proper remedy should be an order to repair and rehabilitate the West Dallas project. The group also objects to the use of § 8 EHP and Voucher units as the replacement units for demolished West Dallas units.

The Committee's written objection was accompanied by petitions stating opposition to the demolition of any currently occupied public housing units in West Dallas. There was no testimony by any of the objectors about how many of those signing the petitions were actually residents of the DHA's West Dallas project. An examination of the addresses of those signing with an allowance for signatures for multiple members of the same households supports a finding that the petitions were signed by members of approximately 500 households who are members of the proposed class residing in the West Dallas projects.

There was credible evidence that a substantial number of the class members residing in the West Dallas project support the settlement. Mr. Dallas Jackson, one of the spokespersons for the Committee, testified that an unspecified but substantial number of the West Dallas residents he had spoken with wanted the opportunities to move from West Dallas that the proposal offers to the class. Ms. Mary Dews testified that in her opinion 85% of the households in the West Dallas project wanted to take advantage of the settlement's opportunities.[2]

## I. GENERAL STANDARDS GOVERNING THE MOTION FOR APPROVAL OF THE SETTLEMENT.

The general standard to be met by a proposal to settle a class action is that it must be fair, adequate, reasonable and not the product of collusion. *Ruiz v. McKaskle,* 724 F.2d 1149, 1152 (5th Cir.1984); *Cotton v. Hinton,* 559 F.2d 1326 (5th Cir. 1977); *Gautreaux v. Pierce,* 690 F.2d 616 (7th Cir.1982) affirming the approval of a consent decree in *Gautreaux v. Landrieu,* 523 F.Supp. 665 (N.D.Ill.1981)—desegregation case involving HUD and the Chicago Housing Authority.

This general standard involves the examination of a number of more specific factors including:

a) the benefits of the compromise in relation to the likely benefits of a trial,

b) the stage of the proceedings at which the compromise is reached,

c) the proposed treatment for the named plaintiffs compared to the other members of the class,

d) complexity, length and expense of further litigation,

e) the circumstances surrounding the actual negotiation of the settlement,

f) the reaction of members of the class to the proposal, and

g) the opinion of competent counsel. *Ruiz,* supra, *Gautreaux,* supra at 631, *Manual of Complex Litigation 2d,* § 30.41 et seq., pages 236–242.

If, after notice of the proposed settlement, there are objections to the proposed settlement, then the court must give those objecting the opportunity to be heard on the basis of their objections. The court must then examine the settlement in light of the objections raised and set forth on the record a sufficient response to the objections including findings of fact and conclusions of law necessary to support that re-

---

**2.** The West Dallas Project has historically been subject to a 15% to 20% turnover rate per year according to the testimony of DHA's Executive Director, Jack Herrington.

sponse whether it be approval or disapproval of the proposal. Both the number of objectors and the quality of their objections must be considered even though a settlement can be fair notwithstanding a large number of class members who oppose it. *Reed v. General Motors Corp.,* 703 F.2d 170, 174 (5th Cir.1983) affirming 560 F.Supp. 60 (N.D.Tex.1982); *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1219 (5th Cir.1978); *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977).

The Court has a further obligation to protect third parties not represented in the case by ascertaining that it is not putting its sanction on and power behind a decree that violates the constitution, statutes or jurisprudence. *Williams v. City of New Orleans,* 729 F.2d 1554, 1559 (5th Cir.1984) en banc.

The Court held a hearing at which all of those wishing to express an objection to the proposal were heard and the Court has considered the testimony and written objections and material submitted in support of those objections.

## II. APPLICATION OF THE STANDARDS TO THIS PROPOSAL.

When, as in this case, the objections raise questions about the scope and type of relief granted by a settlement, the key inquiry is the comparison of the terms of the proposal with the likely relief the class would have received following a successful trial. *Reed,* supra at 703 F.2d 172. This focuses the court's attention on two elements: probability of success on the merits and the range of possible recovery.

### A. Probability of Success

The purpose of this inquiry is not to try the case since the aim of the parties in settling the issues is to avoid the delay and expense of a trial and the risks of an adverse judicial determination. *Reed,* supra at 703 F.2d 172. Plaintiffs' counsel in this case stated that their reason for settlement was not based on any perceived weakness in their case involving the liability of DHA and HUD. Their recommendation for approval of the settlement is based rather on their assessment of the range of possible remedies and defendants' ability to choose a remedy for West Dallas that involves demolition and replacement rather than repair, the greater effectiveness in disestablishing the effects of the prior segregation of the proposed plan over a remedy that would repair all 3,500 units in the West Dallas project, the lack of legal barriers to the demolition of public housing units, and the delay inherent in full litigation of liability and remedy.

HUD strenuously asserts that plaintiffs would not be able to establish any liability on the part of the agency, and in any event the remedies available would be limited.

The objectors do not disagree with plaintiffs' counsels' liability assessment, but rather assert that a deseg gation remedy is possible that does not involve demolition. The objectors state that the proper remedy is an order requiring the repair and rehabilitation of the West Dallas project. The objectors also requested that the Court delay approval for an unspecified time in order to allow them to present alternatives to the demolition provisions and requested that if the Court was going to approve the settlement, that it approve all of the settlement except for the provisions involving demolition in West Dallas.

The objectors do not dispute that the units to be demolished in the West Dallas project meet the legal criteria for demolition approval by HUD. They admit that under current law there is no requirement that units demolished be replaced on any basis, much less a one for one basis. 42 U.S.C. § 1437p; 24 CFR 970.

In its evaluation of the proposed decree and the objections, the Court accepted plaintiffs' assertion that they would be able to prove their specific allegations of purposeful racial segregation and its decision is based on these representations of plaintiffs' counsel as to their case on liability. This acceptance of plaintiffs' view of the strength of their case is solely for purposes of assessing the merits of the objections and is not to be taken as a ruling or a

finding by the court on the underlying liability of either defendant.

Plaintiffs brought this suit to remedy defendants' policies and practices which they claim have maintained and perpetuated racial segregation in DHA's housing programs. [See Plaintiffs Exhibits 1 and 2 for summaries of the racial occupancy patterns of DHA's projects and programs.] According to plaintiffs, in recent years, DHA and HUD have been maintaining intra-program segregation within DHA's programs by assigning white elderly tenants to predominantly white projects and black elderly tenants to predominantly black projects, elderly and family. In addition, defendants have engaged in racial segregation affecting all black recipients by operating DHA's programs to present black recipients of HUD/DHA assistance with the choice of only predominantly black housing in predominantly black areas for the purpose and effect of perpetuating racial residential segregation. The inevitable corollary to such segregation, unequal conditions, was also a major focus of the case with respect to the West Dallas projects and the § 8 EHP program. [Substantial rehabilitation of the other black projects is currently completed or in progress.]

Because the focus of the objection to the settlement is on the remedy as it affects the West Dallas projects, Plaintiffs submitted the following facts through testimony and exhibits on that issue.

DHA's West Dallas project was recently described as "a gigantic monument to segregation and neglect" by Dallas City Council members Al Lipscomb and Diane Ragsdale. [Jan. 2, 1987 letter to the Court]. This phrase accurately sums up both the present state and the history of the project. The conditions in the West Dallas Projects are not new. The same problems that continue to plague the present residents have been in existence since the inception of the Project. Efforts at solutions have likewise been consistent in their result. They have failed.

### 1. The West Dallas Area

The West Dallas projects are located in the West Dallas community. This area is bounded by the Trinity River to the North, the Continental Street Bridge to the east, I-30 to the south and Loop 12 to the west. The population of the area is composed primarily of minority households, 60% black and 30% spanish origin.

West Dallas is and always has been one of the poorest communities in the county. The median income in the 1980 census was $9,481 compared to a City median of $21,872. 2,751 households [32%] out of a total 8,669 were below poverty level. 4,308 [50%] of the households receive public assistance or social security. The 1980 median housing value was $16,876 and the median rent was $86, both figures among the lowest in the county.

Unemployment is high and education levels low in West Dallas. Unemployment levels in West Dallas consistently run at least twice that of the city. 75.1% of the adult population has not completed high school compared with 32.8% citywide. 5.2% of the West Dallas population has some college education while 39.8% of the citywide population has some college.

Housing conditions in West Dallas are poor in comparison to the rest of Dallas. West Dallas has the largest proportion of boarded up units [10.9%] and the largest proportion of overcrowded households [10.0%] in the City according to 1980 Census data.

### 2. West Dallas Projects—history and conditions

The poverty and housing conditions in the West Dallas DHA projects are even more extreme than in West Dallas generally. 67% of the residents are receiving some form of federal assistance. 73% of the residents' incomes are less than $5,000 per year.

There are 3,500 units in the three West Dallas project sites: George Loving Place —1500, Edgar Ward Place—1500, Elmer Scott Place—500. Since 1980, there have been an average of 1,340 units [38%] vacant in the project. [Exhibit 3 is a summa-

ry of the vacancy history of the project.] Approximately 1,200 of these vacant units are boarded up and unavailable for use because of their uninhabitable condition. A substantial majority of the occupied units fail to meet even minimum standards for decent, safe and sanitary housing. There have been severe problems with the utility distribution systems. A substantial portion of the project has been subject to lead contamination from an adjacent lead smelter. DHA estimates that at least 65 million dollars would be necessary to restore all units in the project to minimum standards of habitability.

The crime rates in the West Dallas project are disproportionately high. One of the city police officers assigned to the project area has testified in congressional hearings that criminal operations, including drug dealing, are rampant in the projects. The officer estimated that hundreds of transients live or hide in vacant units in the projects. DHA's own analysis of police statistics revealed that the incidence of murder in the West Dallas Projects is 4.69 times the incidence in the rest of Dallas, and the incidence of rape is 6.19 times the incidence of rape in the rest of Dallas.

The executive director of DHA summarized the present conditions at the West Dallas project in his testimony before a Congressional sub-committee hearing on October 15, 1985 as:

"In the three West Dallas housing projects—George Loving Place, Edgar Ward Place and Elmer Scott Place— there is an urgent need to reverse 30 years of wear, deterioration, vandalism, poor maintenance and inadequate funding. The overall housing conditions and 1,200 vacant, uninhabitable units have a negative impact on surrounding neighborhoods, business, industry and the city as a whole. *More than 8,000 adults and children live in a square mile area which has become, in many respects, a publicly owned slum*". (emphasis added)

35 years of federal and local efforts have not changed much on the site on which the project is located. The DHA's 1950 application for the original funding to construct the project contains the following description of the proposed site for the project:

"The area selected is in what is known as 'West Dallas', a sprawling slum community of approximately five square miles ... West Dallas is the largest concentration of sub-standard dwellings and slum conditions in and around Dallas ..."

The project was planned, developed and occupied under an overt policy of racial segregation. The segregation included setting aside separate parks and commercial areas for the separate races.

In 1957, 2 years after the West Dallas project opened for occupancy, DHA listed the following negative factors which it believed were responsible for the lack of white and latin american occupancy in the sites designated for those races:

"1. The 'stigma' attached to the area known as 'West Dallas".

2. Lack of adequate shopping facilities, churches and cultural facilities.

3. Environmental disadvantages, such as odors, smoke, and dust from neighboring industrial plants.

4. Need for additional policing in the 'west Dallas' area." In the same document, DHA noted that:

"It should be pointed out that no occupancy problem has been encountered in connection with Project TEX–9–11 B, 1500 units for Negro occupancy. Although the latter project is also located in West Dallas and is subjected to the same adverse factors influencing TEX–9–11 A and TEX–9–11 C, it is apparent that the heavy and constantly increasing demand for low-rent public housing for Negroes *and the lack of other adequate housing for Negroes in this community* (emphasis added) have combined to overcome all adverse factors and this has resulted in a stabilized occupancy with a long waiting list of Negro applicants."

There have been several unsuccessful efforts to cure the publicly owned slum which replaced the sprawling slum. From 1967 through 1975, DHA applied for reha-

bilitation funds for all of its projects, including West Dallas. HUD denied this funding for reasons which included DHA's blatant violation of Title VI.

In 1976 DHA secured a $13,000,000 rehabilitation grant for the West Dallas project. The grant was not on its face sufficient to provide for the substantial rehabilitation necessary. The $13,000,000 spread over the 3,500 units resulted in a per unit allocation of $3,700. Realistic funding for the rehabilitation of the other projects in Dallas has been for between $22,000 and $25,000 per unit allocation. The administration of the grant was marked by incompetence, theft and fraud and resulted in little or no improvement in unit, project, or community quality. When the grant was closed out, there were approximately 1,200 units still vacant and uninhabitable.

In 1983 DHA applied for $54,000,000 to rehabilitate West Dallas. HUD gave notice that it would provide only $18,000,000 for the project and would provide this amount only on the condition that DHA would *not* apply for any more HUD funds to rehabilitate West Dallas. HUD required as a condition of this grant that DHA submit a workable plan to make the West Dallas project a "viable" project. The plan could not include the use of HUD funds other than the $18,000,000.

DHA engaged in 2 attempts to plan for and fund the renovation of West Dallas into a "viable" project. The first attempt resulted in the "West Dallas Master Plan" which was developed with widespread community and project resident involvement and called for the reduction of low-income units in West Dallas from 3,500 to between 1,400 and 2,000. The remaining units were to be either market rent or home ownership units. There would be no replacement of the units removed from the low-income housing stock. DHA was unable to obtain funding for this program.

The second attempt was through the recent City of Dallas "Mayor's Task Force on Public Housing". The Task Force recommended that the City of Dallas use federal Community Development Block Grant funds to rehab 200 West Dallas units a year at below minimum standards for a per unit cost of $7,000. There is serious question whether this minimum rehabilitation would have met HUD's standards for "viability." The City Council refused to commit even this amount, and rejected the proposal.

In August of this year, HUD announced that it was continuing to withhold permission for DHA to use the $18,000,000 allocated for West Dallas renovation because DHA had not been able to satisfy the "viable project" requirement of the funding.

As a vestige of the purposeful segregation, the West Dallas project looms large. The existence of the West Dallas Projects affects all families in the DHA system, not just those residing in the project. An average of 1,300 units of much needed assisted housing have been held off the market because of HUD's and DHA's failure to solve the West Dallas problem. Because West Dallas chronically has the most vacancies applicants for housing have periodically been advised that it was the only housing available. During the period between January 3, 1986 and October 3, 1986 the rejection rate for offers of units in each one of the three West Dallas sites was over 50% There was testimony that many persons faced with that choice avoid DHA housing altogether. The extent to which West Dallas project residents have been victims of crime has been cited as a basis for denying transfer requests to other DHA projects. The existence of the uninhabitable units in West Dallas is regularly cited as a basis for opposition to development of additional low income housing in other parts of the city.

As an example of the many ways in which the operation of the West Dallas Project affects all the residents of DHA's system is the testimony of Jack Herrington that DHA was faced with the imminent prospect of the loss of $1,500,000 from its overall operating subsidy from HUD because DHA could not achieve full occupancy of the West Dallas Project. The loss of this revenue would have a drastic effect on

the level of services DHA would be able to offer all of its residents.

DHA has been trying unsuccessfully to obtain modernization money for West Dallas since 1967. DHA itself has no taxing authority but is dependent upon HUD for its financial existence. Neither HUD nor the City of Dallas has been, is, or is likely to be in the future, willing to provide the money necessary to equalize and bring up to standard all the units in West Dallas. There are significant legal obstacles in the path of any attempt to use federal law to require the rehabilitation of the entire West Dallas project. *Edwards v. District of Columbia*, 628 F.Supp. 333 (D.D.C.1985) and cases collected therein. This is particularly true in light of HUD's and DHA's stated preference for providing units through alternative means in order to remedy any purposeful segregation or discrimination found by the Court.

The demand for the Section 8 program is greater than the Low Rent Public Housing Program. As of August of this year the Section 8 waiting list contained 2700 persons and the LRPH program waiting list only approximately 650. The number of persons wanting to get on the Section 8 program would have been higher had DHA not been enforcing its policy that no person residing in a project could apply for Section 8 without first moving out of public housing for 90 days. Both waiting lists are overwhelmingly black.

B. Range of Possible Recovery

The general rule governing relief for purposeful maintenance of and perpetuation of racial segregation by a public housing authority and HUD is set out in *Hills v. Gautreaux*, 425 U.S. 284, 297, 96 S.Ct. 1538, 1546, 47 L.Ed.2d 792 (1976). *Hills* followed the standards set out in the Supreme Court's school desegregation cases and stated that all reasonable methods be available to formulate an effective remedy and that every effort should be made by a federal court to employ those methods to achieve the greatest possible degree of relief, taking into account the practicalities of

the situation. *Hills* specifically approved the use of § 8 program funds as an element of a public housing authority's desegregation plan. *Hills*, supra at 425 U.S. at 303–305, 96 S.Ct. at 1549–1550.

Once a violation of the equal protection principle is shown, the obligation of the defendants is to submit a plan for the complete remedy of the condition that offends the constitution. *Wise v. Lipscomb*, 437 U.S. 535, 541, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978)—unconstitutional election scheme; *Brown v. Board of Education (II)*, 349 U.S. 294, 299, 75 S.Ct. 753, 755, 99 L.Ed. 1083 (1955)—school desegregation; *Green v. School Board of New Kent County*, 391 U.S. 430, 440, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716 (1968)—school desegregation; *Jaimes v. Toledo Metropolitan Housing Authority*, 758 F.2d 1086, 1108 (6th Cir.1985) public housing segregation; *Davis v. East Baton Rouge Parish School Board*, 721 F.2d 1425, 1436 (5th Cir.1983)—school desegregation. The defendants' plan must promise meaningful and immediate progress toward disestablishing the vestiges of the state imposed segregation. If the court finds that the defendant is acting in good faith and the proposed plan has real prospects for dismantling the segregative system, then the plan is approvable. *Green*, supra at 391 U.S. at 439, 88 S.Ct. at 1694.

In this case, plaintiffs and plaintiffs' counsel assert that the proposed decree meets the standard for an approvable desegregation remedy that the defendants could propose for adoption after a finding of liability on the merits. HUD maintains that it could not be compelled to provide the allocation of new resources which are contained in the settlement. The objectors assert that the element of the plan allowing demolition of up to 2,600 of the 3,500 units in the West Dallas project should not be part of the desegregation plan and that instead of demolition, repair and rehabilitation should be required.

Plaintiffs have always maintained that the Court has the authority to order the removal of the unequal conditions vestige of unlawful segregation by an order to

require the equalization of facilities, in this case an order to rehabilitate slum conditions in a *de jure* black project. The proposed decree does provide for comprehensive rehabilitation of 800–900 units in the West Dallas project. Plaintiffs' agreement that the Court would have the general power to order rehabilitation of unequal facilities that were a vestige of *de jure* segregation does not extend to an agreement that such an order would be the necessary result in this case. The closing of a facility is a recognized, legitimate device in the formulation of a desegregation remedy. *Valley v. Rapides Parish School Bd.*, 702 F.2d 1221, 1227 n. 7 (5th Cir.1983); *Lee v. Anniston City School System*, 737 F.2d 952, 956 (11th Cir.1984).

Plaintiffs base their acceptance of the proposed demolition and replacement of the West Dallas units in part upon the grounds that absent a violation of other laws or legal principles, defendants will, if liability is established, have the option of proposing to remedy those vestiges of segregation by effectively closing a major part of the project and replacing the units with units of standard quality in other parts of town. Plaintiffs stress that their acceptance of the demolition provisions for West Dallas is based on the unique and many faceted problems presented by that project, and in no way should be construed as applying to the circumstances of any other project.

Plaintiffs are concerned that a proposal to rehabilitate all 3,500 units in the West Dallas project would cure only one vestige, the unequal physical conditions of the units. It would leave in place the following vestiges of segregation:

1) The size of the projects. Nowhere in the city or the county are white low income citizens subjected to such a high concentration of assisted units as a condition of receiving DHA or HUD assistance. Most of the predominantly white DHA or HUD projects range in size from 100 to 400 units in a project. 2) Given the admitted lack of realistic prospects for a racially integrated occupancy pattern in the West Dallas project, repair of the entire project will continue to subject several thousand members of the class to the same choice of all black housing in an all black area as they were subjected to under *de jure* segregation. The settlement permits a reduction in the amount of segregated housing which DHA offers its applicants.

3) Physical rehabilitation of the units themselves will not cure the vestige of the adverse social and environmental conditions caused by the concentration of such a large number of low income housing units in this particular area, which is also a low income impacted neighborhood.

The proposed plan for West Dallas ameliorates the above vestiges to a greater extent than total rehabilitation of all the units.

Moreover the decree insures that current members of the class who desire it will be afforded a desegregated housing alternative primarily through the Section 8 EHP. The large number of additional Section 8 units made available through this settlement is an essential part of providing that remedy for West Dallas tenants in an expeditious manner, and reducing the amount of segregated housing which DHA offers to black families in need of its assistance.

The objections are also based upon the contention, for which there is consensus among all parties, that there is a greater demand for low income housing in Dallas than is currently available. The proposed decree will, if fully and successfully implemented, increase the amount of DHA/HUD assisted housing by approximately 1300 units over what is currently available to low income persons in need of such assistance. This will be accomplished in a much faster time under the terms of this decree than would occur if the Court were to, after a trial, order DHA and/or HUD to rehabilitate all 3500 units.

Under the terms of the settlement current residents of the West Dallas projects who do not wish to exercise the various options to relocate outside the West Dallas Projects can choose to stay. While they may be relocated from the unit in which they currently reside pending availability of a modernized unit, that inconvenience

would occur under any circumstances if all the units were to be modernized. The housing opportunities available under the decree will be available to all families in the clearance areas who have not otherwise chosen to relocate permanently, until such time as they can be offered a modernized unit of the appropriate size in one of the modernized areas of the West Dallas project.

The demolition plan submitted to HUD, in addition to being consistent with the terms of the settlement, must not otherwise violate the Housing Act and the regulations and the protections afforded therein. The objectors' citation to the provisions of H.R. 1 is somewhat premature.

The use of the Section 8 certificate and voucher program as replacement units is not inconsistent with existing law, and reflects a Congressional policy in favor of more mobile housing assistance. It is also consistent with the demand of those persons seeking DHA housing assistance. However, to the extent that any current resident of West Dallas desires to relocate, but prefers project assistance, they will be afforded that option. Under the proposed settlement such persons will have priority for units in the other DHA LRPH projects around the city, including the modernized units becoming available.

The concerns regarding availability, quality and discrimination in the operation of the Section 8 program are shared by the plaintiffs and are addressed by other portions of the decree. Plaintiffs employed an expert whose analysis revealed the existence of a substantial amount of rental housing eligible for the § 8 EHP throughout the City and the metropolitan area.

The relief afforded to the class, including the provisions affecting the West Dallas project, are within the scope of remedy available if plaintiffs were to prevail on the merits. *Gautreaux v. Hills,* supra.

### C. Stage of the proceedings at which the compromise is reached

The Court finds that the proposed settlement in this case has been reached only after extensive investigation, research, discovery and briefing.

The suit was filed in August of 1985. It was subsequently amended to bring in HUD and DHA as defendants in October, 1985. The motion for class certification was filed and briefed by all parties. HUD filed a motion for judgment on the pleadings and plaintiffs responded. Plaintiffs filed a motion for a preliminary injunction requiring the operation of DHA's § 8 program in the suburbs. Plaintiffs and DHA subsequently entered into an agreed order providing for interim operation of the § 8 program in the suburbs. HUD filed a motion to stay discovery and to require plaintiffs to replead their case to which plaintiffs responded.

Extensive discovery has been conducted in the case, including numerous sets of written discovery, document production, and depositions. Plaintiffs engaged and worked with two experts, and had spent a large amount of time in preparation of the case by the time settlement negotiations were entered into.

### D. Circumstances surrounding the actual negotiation

According to all parties, the negotiations were without question at "arms length", and were often marked by less than cordial relations between the negotiators.

There was no simultaneous negotiation on the questions of class relief, individual damages and attorney's fees.

### E. Treatment of named plaintiffs in relation to class relief

There is no special treatment under the proposed decree for the named plaintiffs. They obtain relief only as members of the class or, in Ms. Dews' case, insofar as her work with class members is affected by the class relief. Plaintiffs' individual claims for damages are reserved for future resolution.

▓▓▓▓▓▓▓▓▓▓▓▓

### F. Complexity, length and expense of further litigation

All parties project some additional discovery on the merits. A hearing on the class certification would be necessary as well as a trial on the merits. The parties project trial time of in excess of 20 days. This type of litigation suggests that lengthy remedy and appellate proceedings would follow any decision on liability. *Gautreaux,* supra. In addition, HUD has pending a motion to stay discovery and reschedule the proceedings that, if granted, could substantially lengthen the proceedings and delay any ultimate ruling on its liability.

### G. Class reaction to the proposal

Proposed class members were given individual notice of the terms of the settlement and the right to file timely objections. Of the approximately 7200 class households so notified, representatives of approximately 500 households signed a petition opposing the demolition of currently occupied units in West Dallas as part of the settlement. The response to the substantive objections is set out above and in the Court's explanation of its decision to approve the settlement made in open court.

The objectors' request for a delay in order to seek alternatives would not be fruitful. As the testimony and evidence indicated, there has been no lack of ideas for solving the problems of the West Dallas project. The problem is a lack of money. No one has been able to point out to the Court a likely source of funds to finance any alternatives developed. Further delay in the implementation of the settlement would penalize both the members of the class who desire to stay in West Dallas and for whom the settlement will provide 815 to 900 renovated units and the class members who desire to use the settlement's options to leave West Dallas.

Because the decree before the Court is a settlement proposal, the Court does not have the option of selecting parts of it for approval. The Court can only approve or disapprove the proposal in its entirety. De-

fendants have strongly expressed their position that they will not engage in further bargaining about the West Dallas provisions should the Court disapprove the West Dallas terms of the settlement. Nor would the parties accept the settlement without the inclusion of the West Dallas terms.

### G. Opinion of competent counsel

Plaintiffs' counsel have been engaged in representation of many plaintiffs in poverty law and civil rights litigation throughout their years of practice. They have experience on the issue of race discrimination and segregation as it affects recipients of federally funding low income housing. They have recommended the settlement as offering the most realistic probability of disestablishing to the extent possible the vestiges of the official segregation complained of in this suit.

### CONCLUSION

The proposed settlement is fair, adequate and reasonable to the class as a whole, and should be approved.

/s/ Jerry Buchmeyer
United States District Judge